**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ROCHESTER DRUG CO-OPERATIVE, INC., | : | Case No.: 6:20-cv-6025 (EAW) |
|  | : |  |
| Plaintiff, | : |  |
| v. | : |  |
|  | : |  |
| HISCOX INSURANCE COMPANY, INC., | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT HISCOX INSURANCE COMPANY, INC.'S**
**MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)**

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
David S. Sheiffer, Esq.
150 East 42nd Street
New York, NY 10017
Telephone: (212) 915-3000
Fax: (212) 490-3038
E-mail: david.sheiffer@wilsonelser.com

*Attorneys for Defendant*
*HISCOX INSURANCE COMPANY, INC.*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................4

    I.      GOVERNMENT INVESTIGATIONS OF RDC ..............................................4

    II.     THE NY OPIOID ACTIONS ....................................................................8

          A.     The Master Complaint ...............................................................8

          B.     The State Complaint ..................................................................9

    III.    THE COVERAGE DISPUTE....................................................................10

ARGUMENT .......................................................................................................................13

    I.      LEGAL STANDARD..............................................................................14

    II.     THIS COURT SHOULD DISMISS PLAINTIFF'S COMPLAINT IN ITS ENTIRETY BECAUSE PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT................................................................15

          A.     Illegal Conduct Exclusion.........................................................15

          B.     Prior Knowledge Exclusion and Fortuity ..................................19

          C.     Consent to Settlement ..............................................................20

CONCLUSION.....................................................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662, 129 S. Ct. 1937 (2009) ...................................................................................... 14

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544, 127 S. Ct. 1955 (2007) ...................................................................................... 14

*Burlington Ins. Co. v. NYC Transit Auth.,*
  29 N.Y.3d 313, 57 N.Y.S.3d 85, 79 N.E.3d 477 (N.Y. 2017) ................................................. 15

*Chambers v. Time Warner, Inc.,*
  282 F.3d 147 (2d Cir. 2002) ............................................................................................... 14, 15

*First Mercury Ins. Co. v. Law Off. of Kenneth B. Schwartz,*
  No. CV 17-1763 (SJF)(AKT), 2019 US Dist LEXIS 35210 (E.D.N.Y. Mar. 1, 2019);
  *aff'd in relevant part* 2019 U.S. Dist. LEXIS 210071 (Dec. 5, 2019) ..................................... 21

*Hartford Ins. Co. v. Halt,*
  223 A.D.2d 204, 646 N.Y.S.2d 589 (N.Y. App. Div. 4th Dep't 1996) .................................... 15

*Ho v. Martin Marietta Corp.,*
  845 F.2d 545 (5th Cir. 1988) .................................................................................................... 18

*Home Ins. Co. v. Spectrum Info. Techs.,*
  930 F. Supp. 825 (E.D.N.Y. 1996) ........................................................................................... 15

*International Asso. of Chiefs of Police, Inc. v. St. Paul Fire & Marine Ins. Co.,*
  686 F. Supp. 115 (D. Md. 1988) ............................................................................................... 18

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,*
  62 F.3d 69 (2d Cir. 1995) ......................................................................................................... 15

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,*
  424 F.3d 195 (2d Cir. 2005) ..................................................................................................... 15

*Lummus Co. v. Commonwealth Oil Refining Co.,*
  297 F.2d 80 (2d Cir. 1961) ....................................................................................................... 18

*Maroney v. New York Central Mutual Fire Insurance Company,*
  5 N.Y.3d 467 (N.Y. 2005) ........................................................................................................ 16

*Mount Vernon Fire Ins. Co. v. Creative Hous.,*
  88 N.Y.2d 347 (N.Y. 1996) ...................................................................................................... 16

10508126v.4

*Nat'l Union Fire Ins. Co. v. Stroh Cos.*,
    265 F.3d 97 (2d Cir. 2001) .................................................................................. 20

*Olin Corp. v OneBeacon Am. Ins. Co.*,
    864 F3d 130 (2d Cir. 2017) .................................................................................. 15

*Renaissance Art Inv'rs, LLC v. AXA Art Ins. Corp.*,
    102 A.D.3d 604, 961 N.Y.S.2d 31 (N.Y. App. Div. 1st Dep't. 2013)................................ 20

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012) .................................................................................. 14

*SI Venture Holdings, LLC v. Catlin Specialty Ins.*,
    118 F. Supp. 3d 548 (S.D.N.Y. 2015) .................................................................. 21

*Smith v. Local 819 I.B.T. Pension Plan*,
    291 F.3d 236 (2d Cir. 2002) .................................................................................. 14

*Stonewall Ins. Co. v. Asbestos Claims Mgt. Corp.*,
    73 F.3d 1178 (2d Cir.1995) .................................................................................. 20

*TLC Beatrice Int'l Holdings v. Cigna*,
    2000 U.S. Dist. LEXIS 2917, 2000 WL 282967 (S.D.N.Y. Mar. 16, 2000) ............................ 21

*U.S. Underwriters Ins. Co. v. Landau*,
    679 F. Supp.2d 330 (E.D.N.Y. 2010) .................................................................. 16

*United States Fid. & Guar. Co. v. Annunziata*,
    67 N.Y.2d 229 (N.Y. 1986) .................................................................................. 15

*Vaughn v. Consumer Home Mortg. Co.*,
    470 F. Supp 2d 248 (E.D.N.Y. 2007,
    aff'd 297 F. App'x 23 (2d. Cir. 2008) .................................................................. 5

*Vigilant Ins. Co. v. Bear Stearns*,
    10 N.Y.3d 170 (N.Y. 2008) .................................................................................. 21

*XL Specialty Ins. Co. v Agoglia*,
    2009 US Dist LEXIS 36601 (S.D.N.Y. Mar. 2, 2009) .................................................. 20

*Zapata v. HSBC Holdings PLC*,
    No. 17-CV-6645 (NGG) (CLP), 2019 U.S. Dist. LEXIS 173087 (E.D.N.Y. Sep. 30,
    2019) .............................................................................................................. 18

**Statutes**

18 U.S.C. § 371 .................................................................................................... 3

21 U.S.C. § 841(a)(1)............................................................................................ 3

21 U.S.C. § 842(a)(5)................................................................................................ 3

21 U.S.C. § 842(c)(2)(A) ........................................................................................... 3

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................... 1, 4, 19, 20, 22

Defendant Hiscox Insurance Company, Inc. ("Hiscox") by and through its attorneys, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, respectfully submits this memorandum of law in support of its motion to dismiss this action, in its entirety and with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

In this insurance coverage dispute, Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") seeks injunctive and declaratory relief requiring Hiscox to advance defense costs for three consolidated civil actions against RDC for its role in creating an opioid crisis in the State of New York (the "NY Opioid Actions").   RDC has admitted that it knowingly engaged in criminal violations of federal laws regarding the distribution of opioids over a period of more than six years, including conspiracy to distribute controlled substances outside the scope of professional practice, conspiracy to defraud the United States, and knowingly failing to furnish suspicious order reports to the United States Drug Enforcement Administration ("DEA"), and has agreed to pay a $20 million fine.   RDC's former Chief Compliance Officer has also entered a guilty plea to three felony charges, and its former Chief Executive Officer has been indicted and faces trial.

The admissions by RDC, which directly support the claims asserted in the NY Opioid Actions, were pursuant to a deal it made with the United States (the "Government") to avoid criminal prosecution and civil liability.   The admissions are set forth in a Deferred Prosecution Agreement (the "DPA") (Dkt. No. 11-1, p. 171-299)[1] and Stipulation and Order of Settlement and Dismissal (the "Stipulation") (*id.*, p. 306-325), both dated April 22, 2019.   Shortly thereafter, the DPA and Stipulation were filed, respectively, in criminal and civil actions brought by the Government against RDC in the Southern District of New York.   RDC's admissions show not only that its criminal enterprise was ongoing when the at-issue insurance policy (the "Policy")

1

was first issued by Hiscox, but also that the company was fully aware at the time of the Policy's issuance that its criminal activity was being investigated by the Government.

Notably, the DPA and Stipulation were not the first time that RDC admitted to violating federal laws regarding the distribution of controlled substances (a fact also never disclosed to Hiscox). In 2015, RDC entered into a civil settlement with the Government, paying $360,000 for having failed to report its sales of controlled substances to the DEA. (Dkt. No. 17-9). Almost immediately after that settlement, RDC resumed its willful violations of federal controlled substance laws, choosing profit over public safety. (Dkt. No. 11-1, pp. 234-237, ¶¶ 37-41).

Among other crimes, RDC admits that it "distributed controlled substances to pharmacies that it knew were dispensing controlled substances for illegitimate purposes, and to pharmacies that it should reasonably have known and intentionally avoided confirming were dispensing controlled substances for illegitimate purposes...because RDC sought to obstruct and obscure [DEA] oversight of the company's practices, including by misrepresenting to the DEA the company's due diligence practices and knowingly failing to file suspicious order reports with the DEA regarding some of RDC's customers' suspicious orders." (*Id.*, p. 213, ¶ 4). In addition, RDC admits that its "senior management, including the company's chief executive officer..., were involved in and directed such conduct, and concealed RDC's practices from the DEA, the company's primary regulator." (*Id.*, p. 214-215, ¶ 6). As a result, of its illegal activities, "from fiscal year 2012 through fiscal year 2016, controlled substances represented approximately 14.6 percent of RDC's revenues, for a total of approximately $1.2 billion in controlled substances sales." (*Id.*, p. 219-220, ¶16).

---

[1] References to docket entries in this and other federal matters shall be made as "(Dkt. No.)."

10508126v.4

RDC's admissions regarding its illegal conduct plainly trigger the Policy's "Illegal Conduct Exclusion," which precludes coverage for all Loss, including defense costs, in connection with any Claim made against any Insured:

> arising out of, based upon or attributable to the ... committing of any deliberate criminal or deliberate fraudulent act, or any willful violation of any statute, rule or law, if any final adjudication establishes that such deliberate criminal or deliberate fraudulent act, or willful violation of statute, rule or law was committed.

Although RDC has attempted to avoid the application of this exclusion by pointing to the "final adjudication" requirement, those efforts are nothing but form over substance.

William Pietuszewski, the former Chief of Compliance of RDC, has pled guilty to violation of 21 U.S.C. § 841 (a) (1) for Conspiracy to Distribute Narcotics, violation of Tile 18 U.S.C. § 371 for Conspiracy to Defraud the United States, and violations of 21 U.S.C. §§842 (a) (5) and (c) (2) (A)  for knowingly failing to report narcotic sales as required by the Controlled Substances Act.  (Dkt. No. 17-10); *see United States of America v. William Pietruszewski*, Case. S.D.N.Y Case No. 19-cr-00282.  Similar charges also remain pending against Laurence Doud, the former Chief Executive Officer of RDC.  (Dkt. No. 17-11); *see United States of America v. Laurence Doud III*, S.D.N.Y. Case No. 19-cr-00285.

As noted, RDC itself admitted such violations by the DPA and Stipulation.  Both the DPA and Stipulation were filed with the Court and the latter was "so ordered" by Judge Lewis Kaplan of the Southern District of New York.  Thus, the issue of RDC's intentional criminal misconduct has been finally adjudicated.  Even if not, RDC is precluded from denying its intentional illegal misconduct by the express terms of the DPA and Stipulation.  (Dkt. No. 11-1, p. 220-221, ¶ 17; p. 316, ¶14).  Accordingly, the Illegal Conduct Exclusion bars coverage as a matter of law and RDC, therefore, fails to state a claim upon which relief may be granted.

Coverage for the NY Opioid Actions is also barred as a matter of law by the Policy's "Prior Knowledge Exclusion," because RDC has admitted that it was knowingly engaged in illegal activity when it applied for the Policy, and had knowledge of the Government's investigation before the Policy was issued, but denied knowledge of any potential claim or investigation to Hiscox. The Policy's "Consent to Settlement Provision," which is fully enforceable under New York law, further bars coverage as a matter of law because RDC's admissions and settlement with the Government made without Hiscox's consent significantly prejudices the defense of the NY Opioid Actions. For these additional reasons, RDC fails to state a claim upon which relief may be granted.

Accordingly, Hiscox respectfully submits that RDC's complaint should be dismissed in its entirety and with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

The underlying NY Opioid Actions include civil actions against RDC by at least thirty one counties, cities, and towns throughout the State of New York. Each of these actions rest upon to RDC's nefarious conduct which has been the subject of investigations and prosecutions by the DEA and the United States Attorney's Office for the Southern District of New York (the "US Attorney") (collectively, the "Government"), since at least 2013.

## I.   GOVERNMENT INVESTIGATIONS OF RDC

The investigations of RDC commenced in August 2013 as a result of its failure to file required reports with the DEA through ARCOS, an automated drug reporting system which monitors the flow of controlled substances. (Dkt. No. 11-1, p. 234, ¶ 37). In, July 2015, the US Attorney filed a civil action against RDC, *United States of America v. Rochester Drug Co-operative, Inc.,* Case No. 1:15-cv-05219-RA (S.D.N.Y.) (the "ARCOS Action"). On July 8, 2015, the Court entered a consent order whereby RDC admitted to violations of the Controlled

4

Substances Act regarding its failure to report as required between July 2012 and July 2014 and agreed to pay a $360,000 penalty. (Dkt. No. 11-1, p. 234, ¶ 37; Dkt. No. 17-9; ARCOS Action, Dkt. No. 2).[2] Almost immediately, RDC abandoned any effort to comply with the Controlled Substance Act at the center of the Government's investigation. (Dkt. No. 11-1, p. 234-237, ¶¶ 37-41).

Sometime thereafter, the DEA and US Attorney resumed its investigation into RDC's distribution practices and, in February 2017, the US Attorney served a civil document request on RDC, seeking documents related to its distribution of controlled substances. (Dkt. No. 11-1, p. 242, ¶51). In November 2017, the US Attorney served a criminal subpoena on RDC. (*Id.*). At some point, RDC began discussions with the Government aimed at settling both criminal and civil claims that the Government intended to bring against it. On April 22, 2019, without notice to or the consent of Hiscox, RDC entered into the DPA and Stipulation agreeing to pay a $20,000,000 penalty. (Dkt. No. 11-1, p. 172, ¶ 3; p. 311, ¶ 3). *See United States of America v. Rochester Drug Co-operative, Inc.,* Case No. 1:19-cr-00290-NRB (S.D.N.Y.) (the "Criminal Action"), and a *United States of America v. Rochester Drug Co-operative, Inc.,* Case No. 1:19-cv-03568-LAK (S.D.N.Y.) (the "Civil Action") (collectively, the "Federal Actions").

By the DPA, RDC admitted "that the facts set forth in the Statement of Facts, attached [to the DPA] as Exhibit C and incorporated [t]herein, are true and accurate, and admits, accepts and acknowledges that it is responsible under United States law for the acts of its officers and employees as set forth in the Statement of Facts." (Dkt. No. 11-1, p. 171, ¶ 2). In the Statement of Facts, RDC admitted to intentional criminal acts that facilitated the opioid crisis, including:

> [F]rom at least in or about January 2012, up to and including in or about March 2017, RDC violated the federal narcotics laws by distributing controlled

---

[2] Courts may take judicial notice of court records. *See, e.g., Vaughn v. Consumer Home Mortg. Co.,* 470 F. Supp 2d 248, 256 n.8 (E.D.N.Y. 2007, aff'd 297 F. App'x 23 (2d. Cir. 2008).

substances — including opioids such as oxycodone and fentanyl — to pharmacy customers that RDC knew were dispensing controlled substances for illegitimate purposes, and to pharmacies that it should reasonably have known and intentionally avoided confirming were dispensing controlled substances for illegitimate purposes. Among other things, RDC dispensed controlled substances to pharmacy customers that its own compliance department had concluded displayed "red flags" associated with diversion of controlled substances, including, but not limited to, dispensing large quantities of highly-abused controlled substances, purchasing little else besides those controlled substances, dispensing controlled substances in quantities consistently higher than accepted medical standards, accepting a high percentage of cash from patients purchasing controlled substances, dispensing to out-of-area patients, filling prescriptions issued by practitioners who were on RDC's "watch list" or under DEA investigation, or being terminated by another distributor. Nonetheless, despite these warnings, RDC continued to sell controlled substances — including oxycodone and fentanyl — to these customers, opened new accounts without conducting due diligence before opening, and delayed or avoided terminating pharmacy customers that RDC knew were dispensing controlled substances for illegitimate purposes, and to pharmacies that it should reasonably have known and intentionally avoided confirming were dispensing controlled substances for illegitimate purposes.

Additionally, during the same period, RDC made false statements to the DEA regarding its program for maintaining controls against the diversion of controlled substances. Specifically, since at least 2007, RDC was aware that it was required by law to maintain a program to guard against diversion of controlled substances by its customers, and that RDC needed to report to the DEA those orders and customers that appeared suspicious. RDC repeatedly represented to the DEA that it had standard operating procedures for conducting due diligence on customer accounts and reporting suspicious orders to the DEA. These statements were untrue. Rather, RDC opened new accounts for pharmacy customers without first conducting due diligence on the pharmacies; released orders of controlled substances to pharmacies that RDC believed were dispensing those controlled substances for other than legitimate medical purposes; increased order limit thresholds so that pharmacies could increase the amounts of controlled substances they were ordering from RDC; shipped orders that RDC's compliance program deemed to be suspicious; and knowingly failed to report suspicious orders to the DEA.

(*Id.*, p. 214, ¶ 5-6).

RDC further admitted that "[d]uring the relevant time period, from 2012 until 2017, RDC's senior management, "including the company's chief executive officer…, were involved in and directed such conduct, and concealed RDC's practices from the DEA, the company's

primary regulator.  (*Id.*, ¶6).  In the DPA, RDC also agreed that "having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement."  (Dkt. No. 11-1, p. 175-176, ¶17).

RDC also entered the Stipulation with the Government, which was "so ordered" by the Court on April 25, 2019 (Dkt. No. 11-1, p. 306-325; Civil Action, Dkt. No. 5).  By the Stipulation, RDC "admits, acknowledges, and accepts responsibility" for substantially the same knowing and intentional conduct:

> RDC knowingly failed to implement an adequate system to detect, investigate, and report suspicious orders of controlled substances to the DEA[;] ... RDC knowingly failed to implement an adequate system to detect, investigate, and report suspicious orders of controlled substances to the DEA[;] ... RDC failed to report to the DEA at least two thousand orders of controlled substances made by its pharmacy customers that should have been reported as suspicious[;] ... RDC internally identified "red flags" suggesting that certain pharmacy customers were dispensing controlled substances that were not for legitimate medical purposes ... [but] RDC did not file suspicious order reports with the DEA[;] ... RDC maintained an internal list that identified prescribers who had been arrested, investigated by state or federal government agencies, subject to state administrative proceedings, or whom RDC compliance personnel had identified as engaging in suspicious prescribing activities ... [but] RDC continued to sell controlled substances to these pharmacies well after placing the prescribers on the list[;] ... RDC developed and implemented a system to identify "orders of interest" ... [that] in a particular category of controlled substances exceeded a monthly purchase threshold, ... [but] RDC often raised the purchase thresholds for certain high-volume customers so that these customers could continue to increase their opioid purchases and dispensing over time[;] ... [and] RDC failed to implement an adequate due diligence program to prevent the diversion of controlled substances by its pharmacy customers.

(Dkt. No. 11-1, p. 309-310, ¶ 2).  The Stipulation also states that RDC will not contest these admissions in any future proceedings.  (*Id.*, p. 316, ¶14).  Pursuant to the Stipulation, the Civil Action was dismissed.

## II.    THE NY OPIOID ACTIONS

At least 31 opioid-related civil actions have been filed against RDC by the State of New York and various counties, cities, and towns throughout the State.  Each rests upon the same misconduct RDC admitted to by the DPA and Stipulation.  This coverage action concerns three such actions consolidated for trial (the "NY Opioid Actions"):

- *County of Nassau v. Purdue Pharma, L.P., et al.*, Index No. 400008/2017 (filed June 12, 2017, RDC added as defendant 10/10/2017) (the "Nassau Action");

- *County of Suffolk v. Purdue Pharma, L.P., et al.*, Index No. 400001/2017 (filed August 31, 2016 as Index No. 613760/2016, RDC added as defendant 10/23/2018) (the "Suffolk Action"); and

- *The State of New York v. Purdue Pharma, L.P., et al.*, Index No. 400016/2018 (filed August 14, 2018, RDC added as defendant March 28, 2019) (the "State Action");

The operative complaint in the Nassau and Suffolk Actions is the Long Form Master Complaint (the "Master Complaint"), filed October, 6, 2017 in *In re: Opioid Litigation*, Index No. 400000/2017 (N.Y. Supr., Suffolk Cnty.) (Dkt. No. 17-2) and the operative complaint in the State Action is the First Amended Complaint (the "State Complaint"), filed March 28, 2019 (Dkt. No. 17-3).

### A.    The Master Complaint

The Master Complaint names a number of manufacturers, distributors, and individuals as defendants, alleging that each is liable for damages as a result of their role in creating an "opioid epidemic."  RDC is identified as one of the "Distributor Defendants," who allegedly played an "integral role in the chain of opioids being distributed throughout" New York by "purchas[ing] opioids from manufacturers…and [selling] them to pharmacies."  (Dkt. No. 17-2, ¶¶ 737; 738).  In that role, the Distributor Defendants allegedly "were each on notice that the controlled substances they … distributed were the kinds that were susceptible to diversion for illegal

8

purposes" and that "there was an alarming and suspicious rise in … distributing opioids to retailers within Plaintiffs' counties during this time period." (*Id.* at ¶¶ 740; 741).

The Distributor Defendants allegedly "had a duty to notice suspicious or alarming orders of opioid pharmaceuticals and to report suspicious orders to the proper authorities and governing bodies" but failed to do so "in the interest of their own massive profits." (*Id.* at ¶¶ 743; 745; 747). The Distributor Defendants also allegedly "displayed a continuing pattern of failing to submit suspicious order reports" despite "charges, fines and penalties" brought against several of them. (*Id.* at ¶¶ 748; 756). In this regard, Master Complaint cites to the 2015 Consent Decree, alleging that RDC paid a $360,000 fine following a DEA investigation and civil suit by the US Attorney and admitted to violations of the Controlled Substances Act in failing to properly file reports concerning potentially suspicious shipments of opioids. (*Id.* at ¶¶ 778-782). Although it does not reference the DPA or Stipulation, RDC's admissions therein are exactly the same misconduct as at issue in the Master Complaint. Accordingly, in the underlying action, Nassau and Suffolk counties have moved for partial summary judgment against RDC based on those admissions. (Sheiffer Decl., Ex. 1).[3]

### B.    The State Complaint

The State Complaint also names a number of manufacturers, distributors, and individuals as defendants. RDC is again identified among the "Distributer Defendants," who allegedly "turn[ed] a blind eye to their obvious compliance deficiencies" and "knew that their internal compliance systems were totally inadequate to provide the anti-diversion monitoring function that was (and is) legally required of all companies selling controlled substances in New York" all

---

[3] Reference to the Declaration of David S. Sheiffer, counsel for Hiscox, and the Exhibit thereto, shall be made as (Sheiffer Decl., Ex. _).

while "knowing that their customers were displaying a continuous parade of red flags indicating illegal activity." (Dkt. No. 17-3, ¶¶ 10; 14).

The Distributor Defendants allegedly failed to "staff their compliance functions with qualified personnel, and failed to provide … [them] with appropriate training" and "none of the Distributor Defendants had a consistent practice of conducting appropriate due diligence of either prospective new customers or their existing customers." (*Id.* at ¶¶ 240; 241). Specifically as to RDC, the State Complaint alleges that it did not have any "formal written standard operating procedures governing its compliance with its anti-diversion duties" until 2015, when it enacted a "fundamentally flawed" one, and RDC continued to "approve[] new customers for the sale of prescription opioids despite the presence of conspicuous red flags." (*Id.* at ¶¶ 738; 761; 746-747; 768).

The State Complaint also points to the 2015 Consent Decree, noting that the US Attorney filed a complaint against RDC for its failure to report opioid orders and "for failing to report the loss and/or theft of controlled substances" in violation of the federal Controlled Substances Act. (*Id.* at ¶¶ 753-754). Despite the decree, between 2012 and 2016, RDC allegedly "consistently underreported suspicious orders to the DEA." (*Id.* at ¶ 767). Again, this is the exact same conduct RDC has admitted to by the DPA and Stipulation.

## III.   **THE COVERAGE DISPUTE**

Hiscox issued Private Company Management Liability Policy No. UVA1901769.17 (the "Policy") to Rochester Drug Cooperative, Inc. for the effective Policy Period of March 8, 2017 to March 8, 2018. (Dkt. No. 1-1). As is pertinent here, the Policy includes a Directors & Officers Liability Coverage Part (the "D&O Coverage"), subject to a $5,000,000 limit of liability and a $25,000 retention. (*Id.* at p. 2). Pursuant to Endorsement No. 17, the Policy provides for an additional $1,000,000 in Defense Costs incurred in excess of the retention. (*Id.* at p. 125).

10

To obtain the Policy, RDC submitted a completed AIG Portfolio Select Application (the "Application") to Hiscox, which was signed by John T. Kinney, RDC's Chief Financial Officer, and dated February 1, 2017. (Dkt. No. 17-4). The Application is expressly incorporated in and made a part of the Policy by Endorsement No. 6. (Dkt. 1-1, p. 87).

Question 17 of the Application inquires: "[d]oes any person or entity proposed for coverage know of or have any information about any pending or prior claim, suit, regulatory action or other proceeding, inquiry or investigation (any of which being a "Known Claim") of or against any proposed insured?" (Dkt. No. 17-4, p. 8 of 38). In response, RDC answered "No." (*Id.*). The Application then states:

> **IT IS AGREED THAT IF ANY SUCH KNOWN CLAIM, PRIOR ACTION OR POTENTIAL EXPOSURE EXISTS, THEN, UNLESS THE RESULTING INSURANCE POLICY EXPRESSLY PROVIDES OTHERWISE, SUCH POLICY SHALL NOT PROVIDE COVERAGE FOR ANY LOSS IN CONNECTION WITH SUCH KNOWN CLAIM, PRIOR ACTION OR POTENTIAL EXPOSURE.**

(the "Prior Knowledge Exclusion") (*Id.* at p. 9 of 38 (emphasis in original)).

The Application also contains a warranty that:

> The undersigned authorized officer of the Applicant declares that the statements set forth herein are true, and agrees that if the information supplied on this application changes between the date of this application and the effective date of the insurance, the Applicant will, in order for the information to be accurate on the date of the insurance, immediately notify the Insurer of such changes, and the Insurer may withdraw or modify any outstanding quotations and/or authorizations or agreements to bind the insurance.

(*Id.* at p. 35 of 38).

Despite admittedly receiving a subpoena from the U.S. Attorney in February 2017, RDC never advised Hiscox about the Government's investigation prior to the issuance of the Policy, much less that its officers were engaged in ongoing criminal conduct, as evidenced both by

RDC's own admissions and the guilty plea by William Pietruszewski, its former Chief Compliance Officer. (*See*, Dkt. No. 17-10).

After being noticed of certain opioid-related matters, by letter of March 22, 2018, Hiscox reserved all rights, including pursuant to provisions concerning the representations in the Application. Hiscox also initially agreed to advance defense costs subject to an allocation between covered and uncovered claims per the terms of the Policy. (Dkt. 11-3, p. 8-15). RDC, however, never responded to Hiscox's efforts to reach an allocation agreement.

Thereafter, RDC provided notice to Hiscox on a rolling basis of numerous additional complaints. On August 24, 2018, Hiscox, through counsel, issued a letter concerning coverage for an additional twenty-five actions again reserving all rights and fully incorporating the coverage and defense positions set forth in its prior letter. (Dkt. No. 11-1, p. 331-336). During this period Hiscox was in regular contact with RDC's broker and attempted on numerous occasions to get copies of defense invoices and to discuss allocation with RDC. For the first time, on June 12, 2018, the broker forwarded invoices from Allegaert Berger & Vogel LLP ("ABV") for work from November 2017 through May 2018. (Dkt. No. 17-5). However, RDC continued to ignore Hiscox's efforts to reach an allocation agreement.

On January 18, 2019, RDC's broker informed Hiscox that Don Bilgore, RDC's general counsel, would finally address allocation. (Dkt. No. 17-6). However, Mr. Bilgore never contacted Hiscox, and Hiscox reached out to the broker again on February 19, 2019. (Dkt. No. 17-7). That same day, Hiscox issued a letter concerning coverage for additional actions filed by the Counties of Otsego and Cattaraugus, continuing to reserve all rights fully incorporating the position set forth in its prior letters. (Dkt. 11-1, p. 338-344). Hiscox did not hear anything further from RDC regarding defense costs until July 26, 2019, when RDC finally attempted to

12

set up a meeting to discuss those issues.  (Dkt. No. 17-8).  At about that time, Hiscox also first learned of the DPA and Stipulation with the Government.

On August 5, 2019, seeking comment from the insured, Hiscox issued a draft letter to RDC advising that, in light of the admissions contained in the DPA and Stipulation, coverage was precluded for all of the NY Opioid Actions, by operation of Section IV.A.(iv) of the Policy's D&O Coverage (the "Illegal Conduct Exclusion").  (Dkt. No. 11-1, p. 7, ¶ 31). The Illegal Conduct Exclusion precludes coverage for Loss in connection with any Claim made against any Insured:

> arising out of, based upon, or attributable to the … committing of any deliberate criminal or deliberate fraudulent act, or any willful violation of any statute, rule or law, if any final adjudication establishes that such deliberate criminal or deliberate fraudulent act, or willful violation of statute, rule or law was committed.

(Dkt. 1-1, p. 20).

On August 29, 2019, RDC responded, disputing Hiscox's position regarding the applicability of the Illegal Conduct Exclusion, asserting that there had been no "final adjudication" necessary to trigger the exclusion.  (Dkt. No. 1-3).  On September 13, 2019, Hiscox issued its final letter denying coverage based on the Illegal Conduct Exclusion. (Dkt. No. 1-4).  In October 2019, Nassau and Suffolk Counties jointly moved for summary judgment against RDC in the combined NY Opioid Actions.  (*See,* Sheiffer Decl., Ex. 1).

Nearly four months after being advised by Hiscox of its coverage decision, on January 10, 2020, RDC filed this action. Hiscox (the "Coverage Action").  (Dkt. No. 1).

## ARGUMENT

The Complaint purports to assert one claim against Hiscox for breach of contract, seeking only injunctive relief and a declaration Hiscox is obligated to pay defense costs for the NY Opioid Actions. (*See* Dkt. No. 1).  For the reasons set forth below, the Complaint should be

13

10508126v.4

dismissed in its entirety, as Plaintiff fails to adequately allege the sole cause of action against Hiscox.

## I.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955, 167 L. Ed. 2d at 1961.

In determining whether a claim is plausible, a court must "accept as true all well-pleaded factual allegations in the Complaint and … draw all reasonable inferences in favor of the plaintiff."  *SEC v. Apuzzo*, 689 F.3d 204, 207 (2d Cir. 2012).  However, "conclusory allegations and legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002). Additionally, the factual allegations in the complaint must be viewed "together with those 'documents…incorporated in it by reference' and 'matters of which judicial notice may be taken.'"  *Apuzzo*, 689 F.3d at 207 (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

In this regard, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Chambers*, 282

14

F.3d at 152 (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Id.* at 153 (quoting *Int'l Audiotext*, 62 F.3d at 72).

## II.      THIS COURT SHOULD DISMISS PLAINTIFF'S COMPLAINT IN ITS ENTIRETY BECAUSE PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT

Under New York law, "[c]onstruction of an insurance policy, like other contracts, is decided by courts as a matter of law." *Home Ins. Co. v. Spectrum Info. Techs.*, 930 F. Supp. 825, 844 (E.D.N.Y. 1996); *see also Burlington Ins. Co. v. NYC Transit Auth.*, 29 N.Y.3d 313, 321, 57 N.Y.S.3d 85, 89, 79 N.E.3d 477, 481 (N.Y. 2017).  "Although any ambiguities must be resolved in favor of the insured, where the provisions of an insurance contract are clear and unambiguous, they must be enforced as written ... and the court 'should refrain from rewriting the agreement.'" *Hartford Ins. Co. v. Halt*, 223 A.D.2d 204, 212-13, 646 N.Y.S.2d 589, 594 (N.Y. App. Div. 4th Dep't 1996) (quoting *United States Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 232 (N.Y. 1986)).  Further, "[a]ny interpretation of a contract that 'has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'" *Olin Corp. v OneBeacon Am. Ins. Co.,* 864 F3d 130, 148 (2d Cir. 2017) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)).

### A.      Illegal Conduct Exclusion

The Policy's Illegal Conduct Exclusion at Section IV.A.(iv) of the Policy's D&O Coverage, upon which Hiscox reserved rights either expressly or by reference in each of its coverage letters, precludes coverage, in relevant part, for Loss in connection with any Claim made against any Insured:

15

> arising out of, based upon or attributable to the … committing of any deliberate criminal or deliberate fraudulent act, or any willful violation of any statute, rule or law, if any final adjudication establishes that such deliberate criminal or deliberate fraudulent act, or willful violation of statute, rule or law was committed.

(Dkt. No. 1-1, p. 20).

The scope of the Illegal Conduct Exclusion is defined by the phrase "arising out of," which is interpreted broadly in New York to mean "originating from, incident to or having connection with." *See U.S. Underwriters Ins. Co. v. Landau*, 679 F. Supp.2d 330, 339-40 (E.D.N.Y. 2010); *Maroney v. New York Central Mutual Fire Insurance Company*, 5 N.Y.3d 467, 473 (N.Y. 2005). The New York Court of Appeals has further held that "this language is unambiguous as used in an exclusion clause and should be applied in the form of a 'but for' test in determining coverage." *Landau*, 679 F. Supp.2d at 340; *see also Mount Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347, 352 (N.Y. 1996).

Given that RDC cannot contest its admissions in the Stipulation and DPA that it knowingly engaged in criminal misconduct, there can be no rational dispute it engaged in illegal conduct. Although the Federal Actions involve different theories of liability, the NY Opioid Actions rest upon the exact same conduct, as all complaints allege that RDC failed to comply with its legal obligations to detect and report suspicious orders of opioids and prevent the distribution and diversion of opioids into the public domain.

For example, in the Stipulation so-ordered by court order on April 25, 2019, RDC admitted that "[t]hrough reports that RDC received reflecting the controlled substances that its pharmacy customers had dispensed, on-site visits of its customers, and other sources, RDC internally identified 'red flags' suggesting that certain pharmacy customers were dispensing controlled substances that were not for legitimate medical purposes" and that, "[n]otwithstanding these 'red flags,' RDC did not file suspicious order reports with the DEA for orders placed by

16

these pharmacy customers." (Dkt. No. 11-1, p. 309, ¶ 2c).  RDC's former Chief of Compliance has also admitted to this criminal conduct.

The State Complaint alleges that "even though their customers were displaying a continuous parade of red flags indicating illegal activity, they continued to pour enormous volumes of opioid drugs into those customers' dispensaries.  All the while, they lied to New York regulators, both affirmatively and by omission, about these and other violations of the New York Controlled Substance Act." (Dkt. No. 17-3, ¶10)  The Master Complaint similarly alleges that "[t]he Defendants were in a unique position and had a duty to inspect, report, or otherwise limit the manufacture and flow of these drugs to Plaintiffs' counties" but "[t]he Defendants, in the interest of their own massive profits, intentionally failed in this duty" and that "[t]he Defendants have displayed a continuing pattern of failing to submit suspicious order reports." (Dkt. No. 17-2, ¶¶ 746-48).

The Illegal Conduct Exclusion focuses on the conduct of this insured, not the legal theories pled.  The exclusion bars coverage for any Claim arising out of, based upon, or attributable to intentional criminal activity.  "Claim" is defined, in relevant part, as Section II.A. of the D&O Coverage as "a civil, criminal, administrative, regulatory or arbitration proceeding." (Dkt. 1-1, p. 14).  Accordingly, because the NY Opioid Actions plainly arise out of RDC's intentional criminal conduct, and would not exist "but for" that conduct, coverage is precluded.

In the Complaint, RDC asserts that there has been no "final adjudication" as required by the Illegal Conduct Exclusion alleging:

> [T]he Deferred Prosecution Agreement and Stipulation do not constitute "final adjudications." After all, Rochester Drug Co-Op has not entered any guilty plea. There has been no judgment against Rochester Drug Co-Op in any of the NY Opioid Litigations, nor in the SDNY Criminal Case or SDNY Civil Case. No judgment will even be filed by the parties unless Rochester Drug Co-Op defaults on the Deferred Prosecution Agreement or Stipulation. Declining coverage based

17

on the Final Adjudication Exclusion is therefore improper; in fact, the exclusion may never apply if Rochester Drug Co-Op continues to comply with the Deferred Prosecution Agreement and Stipulation.

(Dkt. No. 1, ¶ 27).  These assertions ignore the fact that, in both the Stipulation and the DPA, RDC expressly admits that it knowingly violated the law and expressly agrees not to make any statement, in litigation or otherwise, contradicting those admissions.  As part of the Settlement agreement, RDC also consented to the entry of a consent judgment against it and provided an executed copy of such a judgment.  (Dkt. No. 11-1, p. 311-312, ¶4; p. 287-299).  The Stipulation was "so ordered" by the court and the case thereby dismissed.

Accordingly, the Stipulation and the DPA are final adjudications of the issue as to whether RDC knowingly violated the law, and the Illegal Conduct Exclusion bars coverage as a matter of law.  *See, e.g., Ho v. Martin Marietta Corp.*, 845 F.2d 545, 548 (5th Cir. 1988) ("[S]ettlement is the final adjudication between the parties of the claims involved in the suit. … Once the district court enters the settlement as a judicial consent decree ending the lawsuit, the settlement takes on the nature of a judgment."); s*ee also Zapata v. HSBC Holdings PLC*, No. 17-CV-6645 (NGG) (CLP), 2019 U.S. Dist. LEXIS 173087, at *11 (E.D.N.Y. Sep. 30, 2019) ("for collateral estoppel purposes, "'[f]inality"…may mean little more than that the litigation of a particular issue has reached such a stage that the court sees no really good reason for permitting it to be litigated again.'" (quoting *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961))); *International Asso. of Chiefs of Police, Inc. v. St. Paul Fire & Marine Ins. Co.*, 686 F. Supp. 115, 118 (D. Md. 1988) (insured's settlement with the government supported insurer's denial of coverage, including for costs of defense, under an exclusion for dishonest acts).

18

As RDC cannot dispute it knowingly engaged in illegal conduct, it does not and cannot state a claim upon which relief may be granted and the Complaint must be dismissed its entirety, with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### B.     Prior Knowledge Exclusion and Fortuity

Even if the Illegal Conduct Exclusion did not apply, coverage for the NY Opioid Action would be barred by the Prior Knowledge Exclusion included in the Application and incorporated into the Policy by Endorsement No. 6. (Dkt. No. 1-1, p. 87). The Application asks whether "any person or entity proposed for coverage know of or have any information about any pending or prior claim, suit, regulatory action or other proceeding, inquiry or investigation (any of which being a 'Known Claim') of or against any proposed insured?" (Dkt. No. 17-4, p. 8 of 38). In response, the Insured answered "No." The Application then states:

> **IT IS AGREED THAT IF ANY SUCH KNOWN CLAIM, PRIOR ACTION OR POTENTIAL EXPOSURE EXISTS, THEN, UNLESS THE RESULTING INSURANCE POLICY EXPRESSLY PROVIDES OTHERWISE, SUCH POLICY SHALL NOT PROVIDE COVERAGE FOR ANY LOSS IN CONNECTION WITH SUCH KNOWN CLAIM, PRIOR ACTION OR POTENTIAL EXPOSURE.**

*Id.* at p. 9 of 38 (emphasis in original)

> The Application also contains a warranty that:

> The undersigned authorized officer of the Applicant declares that the statements set forth herein are true, and agrees that if the information supplied on this application changes between the date of this application and the effective date of the insurance, the Applicant will, in order for the information to be accurate on the date of the insurance, immediately notify the Insurer of such changes, and the Insurer may withdraw or modify any outstanding quotations and/or authorizations or agreements to bind the insurance.

*Id.* at p. 35 of 38.

This exclusion is, of course, also consistent with the basic requirement under New York law that "insurance is not available for losses that the policyholder knows of, planned, intended

or is aware are substantially certain to occur." *Nat'l Union Fire Ins. Co. v. Stroh Cos.*, 265 F.3d 97, 106 (2d Cir. 2001); *see also Stonewall Ins. Co. v. Asbestos Claims Mgt. Corp.*, 73 F.3d 1178, 1215 (2d Cir.1995) ("insurance cannot be validly purchased for known losses."). This "known loss doctrine" or "fortuity doctrine" is settled common law, and does not require policy language excluding coverage for injuries that were known to the insured.

RDC's admissions that it was engaged in ongoing, intentional criminal activity at the time the Policy was issued, as well as that it had notice of the Government's investigation prior to the Policy's inception, demonstrate that any Loss resulting from RDC's criminal activity was not fortuitous and is barred as a matter of law both by the Prior Knowledge Exclusion and by public policy. *See, e.g. XL Specialty Ins. Co. v Agoglia*, 2009 US Dist LEXIS 36601 *31-32 (S.D.N.Y. Mar. 2, 2009) (applying a similar exclusion); *Renaissance Art Inv'rs, LLC v. AXA Art Ins. Corp.*, 102 A.D.3d 604, 605, 961 N.Y.S.2d 31, 33 (N.Y. App. Div. 1st Dep't. 2013) (upholding dismissal of loss found to not be fortuitous). For these further reasons, RDC does not and cannot state a claim upon which relief may be granted and, therefore, the Complaint must be dismissed its entirety, with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### C.    Consent to Settlement

The Policy at Section VII of the D&O Coverage Part (the "Consent to Settlement Provision") provides, in pertinent part, that "the Insured shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, incur any Defense Costs … without the prior written consent of the Insured. If the Insured admits or assumes any liability in connection with any Claim without the consent of the Insurer, then the Insurer shall not have any

I0508126v.4

obligation to pay Loss with respect to such Claim." (Dkt. No. 1-1, p. 26).  The definition of Loss includes defense costs.  (*See*, *id.* at p. 16-17).

Under New York Law, "consent-to-settle provisions — requiring insured parties to give insurers notice before entering into voluntary settlement agreements — are routinely enforced as a condition precedent to coverage." *SI Venture Holdings, LLC v. Catlin Specialty Ins.*, 118 F. Supp. 3d 548, 550 (S.D.N.Y. 2015) (quotation marks omitted); *see also TLC Beatrice Int'l Holdings v. Cigna*, 2000 U.S. Dist. LEXIS 2917, 2000 WL 282967, at *4 (S.D.N.Y. Mar. 16, 2000) (enforcing an insurance contract whose "plain language...require[d] that the insured obtain the written consent of the insurer before agreeing to settle a claim[] [a]s a condition precedent to coverage").  "This same is true, moreover, of settlements between private actors and public agencies that arise from enforcement actions." *Id. at* 550-51; *see also Vigilant Ins. Co. v. Bear Stearns*, 10 N.Y.3d 170, 177-78 (N.Y. 2008).

Indeed it is settled that where liability established by a guilty plea and confession of judgment is coextensive with the same conduct against which an insured must defend in a civil action, absent the insurer's consent this a breach of the policy's conditions, and an insurer then has no further defense obligation. *First Mercury Ins. Co. v. Law Off. of Kenneth B. Schwartz*, No. CV 17-1763 (SJF)(AKT), 2019 US Dist LEXIS 35210 *49-50 (E.D.N.Y. Mar. 1, 2019); *aff'd in relevant part* 2019 U.S. Dist. LEXIS 210071 (Dec. 5, 2019) (breach of consent provision permitted insurer to withdraw from defense and recover defense costs paid).

Here, there is no dispute that RDC did not obtain Hiscox's consent to its admissions and settlement with the Government whereby it agreed not to contest its admissions on liability, which is the exact conduct at issue in the NY Opioid Actions.  In fact, Nassau and Suffolk Counties, plaintiffs in the NY Opioid Actions, moved for partial summary judgment on their

negligence, public nuisance, and unjust enrichment claims solely based on those admissions, which RDC is precluded from denying.  (Sheiffer Decl., Ex. 1).  The Consent to Settlement Provision, therefore, bars coverage for those matters as a matter of law.  For this additional reason, RDC does not and cannot state a claim upon which relief may be granted and, therefore, the Complaint must be dismissed its entirety, with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## CONCLUSION

For the foregoing reasons Hiscox respectfully requests that the Court issue an order dismissing RDC's complaint in its entirety, with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:      February 6, 2020

Respectfully submitted,

David S. Sheiffer, Esq.
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
150 E. 42nd Street
New York, NY 10017
Tel.  (212) 490-3000
Fax.  (212) 490-3038
(david.sheiffer@wilsonelser.com)

To:     Patrick Tomovic, Esq.
        Lauren R. Mendolera, Esq.
        HARTER SECREST & EMERY LLP
        *Attorneys for Plaintiff*
        50 Fountain Plaza, Suite 1000
        Buffalo, NY 14202
        Telephone: (716) 853-1616
        ptomovic@hselaw.com
        lmendolera@hselaw.com

22