UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROCHESTER DRUG CO-OPERATIVE,
INC.

                    Plaintiff,                                    **DECISION AND ORDER**

            v.                                                   6:20-CV-06025 EAW

HISCOX INSURANCE COMPANY, INC.,

                    Defendant.
_____

## INTRODUCTION

Plaintiff Rochester Drug Co-Operative ("Plaintiff") brings an action against Hiscox Insurance Company, Inc. ("Defendant") for breach of an insurance policy due to Defendant's refusal to advance reasonable defense costs for a trial. (Dkt. 1).

On January 24, 2020, Plaintiff filed a motion for preliminary injunction seeking an order pursuant to Federal Rule of Civil Procedure 65(a) enjoining and restraining defendant Hiscox Insurance Company, Inc. ("Defendant") from "[d]ishonoring [Plaintiff's] . . . right to the advancement of current and future defense costs, inclusive of attorneys' fees, discovery expenses, and expert fees; and . . . [r]efusing to advance reasonable defense costs" in connection with three lawsuits scheduled to go to trial on March 20, 2020, in New York State Supreme Court, Suffolk County. (Dkt. 11). The Court issued an Order on February 25, 2020, granting Plaintiff's motion subject to it posting a bond in the amount of five hundred thousand dollars ($500,000), and noting that a Decision and Order would subsequently be issued memorializing the Court's reasoning in further detail. (Dkt. 44).

- 1 -

Also presently before the Court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. 21)

The Court now issues this Decision and Order setting forth in further detail its reasons for previously granting Plaintiff's motion for preliminary injunction, and for those same reasons, it now denies Defendant's motion to dismiss.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a drug distribution cooperative owned by and run for the benefit of independent pharmacies.  (Dkt. 11-3 at ¶ 3).  Plaintiff purchases pharmaceuticals directly from manufacturers and distributes them to licensed pharmacies throughout the northeast.  (*Id.*).  Headquartered in Rochester, Plaintiff employed a total of 183 employees, including 97 in Rochester.  (*Id.*).

Over the past two years, Plaintiff has been sued, alongside other drug distributors, in more than thirty-one actions throughout the state of New York, both state and federal, for its alleged involvement in the unlawful distribution of opioids ("NY Opioid Lawsuits").  (Dkt. 11-1 at ¶ 6).  These cases include three actions brought by Nassau County, Suffolk County, and the State of New York (the "Trial Litigation").  (Dkt. 11-3 at ¶¶ 6, 10).

In July 2015, the U.S. Attorney's Office for the Southern District of New York filed a civil action against Plaintiff based on Plaintiff's failure to file required reports with the U.S. Drug Enforcement Agency ("DEA").  (Dkt. 11-1 at 234).  On July 8, 2015, a consent order was entered where Plaintiff admitted to violations of the Controlled Substances Act regarding its failure to report and agreed to pay a $360,000 penalty.  (*Id.*).  In February

2017, the Government served a civil document request on Plaintiff seeking documents related to its distribution of controlled substances.  (*Id.* at 242).

On February 1, 2017, Plaintiff submitted a completed AIG Portfolio Select Application for an insurance policy to Defendant (the "Application").  (Dkt. 20).  In March 2017, Plaintiff purchased Private Company Management Liability Insurance Policy No. UVA 1901769.17 from Defendant, effective from March 8, 2017, to March 8, 2018 (the "Policy").  (Dkt. 1-1 at 22-147).  Defendant agreed under the Policy to pay up to $5,000,000 for defense costs incurred to defend Plaintiff against covered claims and an additional executive limit of liability of $1,000,000, subject to a $25,000 retention.  (*Id.* at 2, 74).  The Policy includes "wrongful acts" coverage, defining a "wrongful act" to include "any breach of duty, neglect, error, misstatement, misleading statement, omission, or act."  (*Id.* at 19). The Policy also contains an exclusion for "any Claim . . . arising out of, based upon or attributable to the . . . committing of any deliberate criminal or deliberate fraudulent act . . . if any final adjudication establishes that such deliberate criminal or deliberate fraudulent act . . . was committed."  (*Id.* at 20).

In November 2017, Plaintiff retained the law firm Allegaert Berger & Vogel LLP ("ABV") to represent it in the NY Opioid Litigation brought by the New York Attorney General and various New York counties and municipalities ("State Actions").[1]  (Dkt. 11-2

---

[1]     ABV was further retained on March 27, 2019, to represent Plaintiff in connection with opioid-related cases filed in the federal multidistrict litigation styled *In re: National Prescription Opiate Litigation*, MDL 2804, currently pending before Judge Dan A. Polster in the Northern District of Ohio.  (Dkt. 11-2 at ¶ 6).

at ¶ 6).  Also in November 2017, the U.S. Attorney served a criminal subpoena on Plaintiff. (Dkt. 11-1 at 242).

Plaintiff notified Defendant of two of the state court lawsuits, and on March 22, 2018, Defendant acknowledged potential coverage for those lawsuits "subject to the Policy's terms and conditions, currently known information and a full reservation of rights." (Dkt. 11-3 at 8-15).  Thereafter, Plaintiff provided Defendant notice of at least 25 other actions, and on August 24, 2018, Defendant once again acknowledged potential coverage for those matters.  (*Id.* at 17-22).  On October 2018, ABV submitted an estimated litigation plan and budget to Defendant.  (*Id.* at ¶ 7).  Before this submission, Defendant had attempted repeatedly to get copies of ABV's invoices and to discuss allocation between covered and uncovered claims.  (Dkt. 17 at 18).  On January 18, 2019, Plaintiff's broker informed Defendant that Plaintiff's general counsel would address allocation, but Defendant was never contacted by the general counsel. (Dkt. 17-6).  On February 19, 2019, Defendant issued a letter acknowledging potential coverage for two additional actions. (Dkt. 11-1 at 338-44).

On April 22, 2019, Plaintiff entered into a deferred prosecution agreement ("DPA") with the U.S. Attorney for the Southern District of New York.  (Dkt. 11-1 at 171-299).  The DPA included admissions of wrongdoing by Plaintiff, and provided for the dismissal of the information with prejudice after five years' compliance with the terms of the agreement. (*Id.*).  On April 23, 2019, Plaintiff stipulated to a civil settlement with the U.S. Attorney for the Southern District of New York (the "Stipulation"), which also contained admissions of wrongdoing and provided that Plaintiff will obtain a release of liability if it complied

with the Stipulation's terms, and that a judgment would be filed only "[i]n the event of an Uncured Default" of the Company's settlement payments. (*Id.* at 306-25). The Stipulation was "So Ordered" by the United States District Judge on April 25, 2019. (*Id.* at 325). On May 3, 2019, William Pietruszewski, Plaintiff's former Chief of Compliance, pleaded guilty in the United States District Court for the Southern District of New York to violations of 21 U.S.C. § 841(a)(1) for conspiracy to distribute narcotics, 18 U.S.C. § 371 for conspiracy to defraud the United States, and 21 U.S.C. §§ 842(a)(5) and (c)(2)(A) for knowingly failing to report narcotic sales. *United States v. Pietruszewski*, No. 1:19-cr-00282-WHP-1, Dkt. 9 (S.D.N.Y. May 3, 2019). Similar charges also remain pending against Defendant's former Chief Executive Officer, Laurence Doud. *See United States v. Doud III*, No. 1:19-cr-00285, Dkt. 1 (S.D.N.Y. Apr. 22, 2019). Plaintiff did not contact Defendant further about the defense costs until July 26, 2019, when Plaintiff attempted to set up a meeting to discuss the allocation issues. (Dkt. 17-8). Also around that time, Defendant learned of the DPA and the Stipulation with the federal government. (Dkt. 17 at 18).

On August 5, 2019, Defendant issued a draft letter to Plaintiff advising that the admissions contained in the DPA and Stipulation precluded coverage for the totality of the State Actions based on the Illegal Conduct Exclusion in the Policy. (Dkt. 15 at ¶ 31). Plaintiff responded on August 29, 2019, disputing Defendant's position regarding the applicability of the Illegal Conduct Exclusion, asserting that there had been no "final adjudication" necessary to trigger the Exclusion. (Dkt. 1-3). Defendant issued its final letter denying coverage on September 13, 2019. (Dkt. 1-4).

On November 13, 2019, Justice Jerry Garguilo in the Supreme Court of the State of New York, Suffolk County bifurcated the claims in the Trial Litigation and ordered a March 20, 2020 trial date for the public nuisance claims. (Dkt. 15-1 at ¶ 10). The plaintiffs in the Trial Litigation produced seven expert reports, the majority of which were served on Plaintiff on or about December 19, 2019. (Dkt. 15-1 at ¶ 15). Plaintiff filed its rebuttal to those expert reports on February 3, 2020. (*Id.*).

Plaintiff filed the instant action on January 10, 2020. (Dkt. 1). On January 21, 2020, Plaintiff hand-delivered to the undersigned's Chambers papers in support of a motion for preliminary injunction, motion to expedite, and motion to seal. On January 22, 2020, the Court granted in part and denied in part the motion to expedite, denied the motion to seal (Dkt. 4), and instructed Plaintiff to file the motion for preliminary injunction, motion to expedite, and motion to seal with proposed redactions by January 24, 2020. (Dkt. 5). Plaintiff timely resubmitted the motion to seal (Dkt. 9), motion to expedite (Dkt. 10), and motion for a preliminary injunction (Dkt. 11) according to the Court's instructions. The Court granted Plaintiff's motion to seal on January 27, 2020. (Dkt. 12). Defendant filed its response to the motion for preliminary injunction on February 3, 2020 (Dkt. 17), and Plaintiff submitted its reply on February 7, 2020 (Dkt. 24). Oral argument was held on February 14, 2020, before the undersigned, who reserved decision and ordered supplemental briefing from the parties. (Dkt. 33; Dkt. 34). Defendant filed its supplemental brief on February 19, 2020 (Dkt. 35), and Plaintiff's supplemental brief was filed on February 20, 2020 (Dkt. 38). On February 25, 2020, the Court issued an Order granting the motion for preliminary injunction subject to Plaintiff posting a bond in the

amount of $500,000.  (Dkt. 44).  Plaintiff has not submitted proof that it posted bond.  On March 16, 2020, the Chief Administrative Judge of the Courts for New York State issued an order postponing "civil jury trials in which opening statements have not commenced" until further notice in an effort to mitigate the effects of the COVID-19 outbreak.[2] Administrative Order of the Chief Administrative Judge of the Courts, New York State Unified Court System, AO/68/20 (Mar. 16, 2020), https://www.nycourts.gov/whatsnew/pdf/AO-68-20.pdf.

On February 6, 2020, Defendant filed a motion to dismiss for failure to state a claim.  (Dkt. 21).  Plaintiff filed its response on February 27, 2020 (Dkt. 45; Dkt. 50),[3] and Defendant replied on March 5, 2020 (Dkt. 48).

On March 12, 2020, Plaintiff filed a voluntary petition in the United States Bankruptcy Court for the Western District of New York (Rochester Division) seeking relief

---

[2]    COVID-19 has caused a global pandemic and public health emergency.  On March 7, 2020, Governor Andrew Cuomo declared a state of emergency for all of New York State related to COVID-19.  *See* N.Y. Exec. Order No. 202 (Mar. 7, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.pdf.    On March 13, 2020, President Trump declared a National Emergency concerning COVID-19.  Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).  According to the World Health Organization's website, as of June 10, 2020, there were 7,145,539 confirmed cases of COVID-19 worldwide, with 408,025 confirmed deaths.  *See Coronavirus (COVID-19)*, World Health Org., https://covid19.who.int/ (last visited June 10, 2020).

[3]    Plaintiff filed its response with certain portions redacted on February 27, 2020.  (Dkt. 45).  The Court ordered Plaintiff to file a motion to seal explaining the proposed redactions pursuant to Local Rule of Civil Procedure 5.3.  (Dkt. 46).  Upon reviewing Plaintiff's motion to seal (Dkt. 47), the Court found Plaintiff's proposed redactions did not overcome the presumption of access to judicial documents, and ordered that the unredacted response be filed on the docket (Dkt. 49).  Plaintiff complied with the Court's order on March 13, 2020.  (Dkt. 50).

under Chapter 11 of the United States Bankruptcy Code.  (Dkt. 55 at 1; Dkt. 56-1).  On April 6, 2020, the Court instructed that the parties advise the Court as to the impact of Plaintiff's bankruptcy filing on this action (Dkt. 54), to which the parties submitted their responses on April 10, 2020.  (Dkt. 55; Dkt. 56).

## DISCUSSION

### I.    Plaintiff's Bankruptcy Filing

As a preliminary matter, the Court agrees with the parties that Plaintiff's bankruptcy filing did not automatically stay this matter.  (*See* Dkt. 55; Dkt. 56).  Filing a Chapter 11 petition operates as a stay of the "continuation . . . of a judicial . . . action or proceeding against the debtor."  11 U.S.C. § 362(a)(1).  The Second Circuit "has recognized that the automatic stay is applicable only to proceedings 'against' the debtor."  *Koolik v. Markowitz*, 40 F.3d 567, 568 (2d Cir. 1994) (citation omitted).  Additionally, "an answer that asserts a counterclaim against a plaintiff who becomes a bankruptcy debtor is an 'action or proceeding against the debtor' within the meaning of § 362(a)(1), notwithstanding the fact that the plaintiff initiated the lawsuit."  *Id.* (quoting 11 U.S.C. § 362(a)(1)).  In the instant matter, Plaintiff filed the lawsuit, and Defendant has not filed any counterclaims.  In other words, the proceeding is not "against" Plaintiff pursuant to 11 U.S.C. § 362(a)(1), and the automatic stay was not triggered.

Defendant also raised the issue of whether this case should be referred to a bankruptcy judge.  (Dkt. 56 at 2-3).  This District's Local Rules of Civil Procedure provide that "[p]ursuant to 28 U.S.C. § 157(a) any and all cases under Title 11 and any and all proceedings arising under Title 11 or arising in or *related to a case under Title 11* are

referred to the Bankruptcy Judges for this district."[4]  L.R. Civ. P. 5.1(f) (emphasis added).

"An action is considered 'related to' a bankruptcy proceeding if the outcome of the litigation 'might have any "conceivable effect" on the bankrupt estate,' or has 'any significant connection with the bankrupt estate.'"  *Pennock v. Dean*, No. 06-CV-266S F, 2007 WL 542132, at *3 (W.D.N.Y. Feb. 15, 2007) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) (internal quotation omitted)).  Here, the insurance policy under which Plaintiff seeks relief is property of the bankruptcy estate.  *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) ("Numerous courts have determined that a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction.").  As a result, the instant matter is "related to" Plaintiff's bankruptcy proceedings, *see In re U.S. Lines, Inc.*, 197 F.3d 631, 638 (2d Cir. 1999) ("[R]esolving disputes relating to major insurance contracts are bound to have a significant impact on the administration of the estate."), and arguably falls under the purview of Local Rule 5.1(f).

Defendant argues this case should not be referred to a bankruptcy judge because the referral rule only applies to "core proceedings," which, Defendant contends, this is not.  (Dkt. 56 at 2-3).  However, the distinction between core and non-core proceedings is not relevant to whether the Local Rule applies.  Local Rule 5.1(f) refers "any and all proceedings arising under . . . or related to a case under Title 11."  In other words, both core and non-core proceedings are referred to a bankruptcy judge under Local Rule 5.1(f).

---

[4]     Defendant refers to a Standing Order issued on February 27, 2012, in its submission, but the Standing Order was superseded by Local Rule 5.1(f).

Nonetheless, to the extent this case has been referred to the bankruptcy court pursuant to Local Rule 5.1(f),[5] the Court finds it appropriate to address the pending motion to dismiss in the instant the matter.   Under 28 U.S.C. § 157(d), a "district court may withdraw, in whole or in part, any case or proceeding referred [to the bankruptcy court] on its own motion or on a timely motion of any party, for cause shown."   The arguments made in the motion to dismiss are substantially, if not entirely, the same as those made in the motion for preliminary injunction.   Because the Court has already ruled on the motion for preliminary injunction and now issues this Decision and Order to further explain its reasoning, and because its reasoning also encompasses the pending motion to dismiss, the Court finds cause to partially withdraw any bankruptcy referral of this matter for the limited purpose of issuing a ruling on the motion to dismiss.[6]  *See In re MF Glob. Holdings Ltd.*,

---

[5]      The parties have not briefed whether litigation such as this that is commenced prior to the bankruptcy filing is automatically referred to the bankruptcy court pursuant to Local Rule 5.1(f) once that bankruptcy filing occurs.   It appears that courts in the Southern District of New York have found that a standing order of bankruptcy referral requires referral to the bankruptcy court even if the action was commenced prior to the bankruptcy filing "if the pending case falls within the terms of the General Reference Order and if the bankruptcy court has jurisdiction over the matter."   *Delcon Const. Corp. v. Bd. of Educ. of City of Yonkers, N.Y.*, 299 B.R. 60, 61 (S.D.N.Y. 2003); *Pan Am. World Airways, Inc. v. Evergreen Int'l Airlines, Inc.*, 132 B.R. 4, 8 (S.D.N.Y. 1991) (finding prepetition causes of action must "still be referred to the bankruptcy court under the mandatory terms of the General Reference Order, as cases related to a proceeding under title 11"); *see also All. Commc'ns Grp., Inc. v. N. Telecom, Inc.*, 65 B.R. 581, 585 (S.D.N.Y. 1986) ("Referral to the bankruptcy court . . . is immediate and automatic[.]").   The Court will obtain further briefing from the parties on this issue as it is relevant to the future handling of this litigation. This Decision and Order only addresses whether, to the extent there is a referral to the bankruptcy court pursuant to Local Rule 5.1(f), it should be partially withdrawn for purposes of the pending motion to dismiss.

[6]      In deciding whether there is "cause" to withdraw a bankruptcy reference, the Second Circuit has outlined several factors a district court should consider, including "whether the

296 F. Supp. 3d 662, 665 (S.D.N.Y. 2017) ("Referrals to bankruptcy courts are matters of efficiency.  The cases still belong to the district court[.]").

## II.    Motion for Preliminary Injunction

### A.    Legal Standard

In order to obtain a preliminary injunction, the moving party must establish the following: (1) a likelihood of irreparable harm absent preliminary relief; (2) a likelihood of success on the merits; (3) the balance of equities tipping in favor of the moving party; and (4) the public interest is served by an injunction.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Where the moving party is unable to demonstrate a likelihood of success on the merits, a court may still issue a preliminary injunction if the moving party demonstrates "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 113-14 (2d Cir. 2006) ("To obtain a preliminary injunction, plaintiff must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial,

---

claim or proceeding is core or non-core, whether it is legal or equitable, and considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law."  *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993). Consideration of those factors warrant withdrawing any referral of the pending motion to dismiss to the Bankruptcy Court.

with a balance of hardships tipping decidedly in plaintiff's favor.") (applying test to request for injunction prohibiting trademark infringement).

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter*, 555 U.S. at 24, and "is one of the most drastic tools in the arsenal of judicial remedies," *Hanson Tr. PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) (quotation omitted). "The district court has wide discretion in determining whether to grant a preliminary injunction[.]" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Moore v. Consol. Edison Co.*, 409 F.3d 506, 511 (2d Cir. 2005)).

### B.   <u>Applicable Burden</u>

"The Second Circuit has . . . differentiated between injunctions that propose to alter the status quo (mandatory injunctions) and those that merely seek to maintain it (prohibitory injunctions)." *XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 271 (S.D.N.Y. 2012). A mandatory injunction may "issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011). "By contrast, a prohibitory injunction may be granted on a showing of '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *XL Specialty Ins. Co.*, 874 F. Supp. 2d at 271 (quoting *Citigroup Global Markets, Inc.*, 598 F.3d at 35). "The heightened standard should only apply 'if a preliminary injunction would make it difficult or impossible to render a meaningful remedy

to a defendant who prevails on the merits at trial.'"  *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 463 (S.D.N.Y. 2005) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 35 (2d Cir. 1995)).

Plaintiff claims the Policy covers 29 or more legal actions brought against it (Dkt. 11-1 at ¶ 26), and ultimately seeks reimbursement for any defense costs in all of those lawsuits as well as reimbursement for the legal fees it has already paid (Dkt. 1 at ¶ 37; Dkt. 15-3 at 9).  In the motion currently before the Court, Plaintiff requests an injunction for payment of current and future defense costs in three cases.  (Dkt. 11-7).  In other words, the ultimate relief Plaintiff seeks differs from the relief sought in the preliminary injunction.  *See In re WorldCom, Inc.*, 354 F. Supp. 2d at 463 (finding the heightened preliminary injunction standard did not apply where the plaintiff "seeks only part of the benefits to which he is entitled under the policy").  Additionally, the relief Plaintiff seeks is the relief that the Policy would require if the contested claims are covered, *see Padberg v. McGrath-McKechnie*, 108 F. Supp. 2d 177, 184 (E.D.N.Y. 2000) ("An injunction which orders a party to perform an action it should previously have performed may be characterized as prohibitory, since it does not change the status quo as it would have existed, absent that party's wrongful action."), and other courts in this district "have found that a preliminary injunction seeking defense costs is not subject to the higher standard," *Stuckey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 131 F. Supp. 3d 73, 83 (S.D.N.Y. 2015); *see XL Specialty Ins. Co.*, 874 F. Supp. 2d at 271-72 (holding "the injunction sought is prohibitory, not mandatory" after finding that the status quo should be measured as of the date "immediately before [the insurance company] told the Insureds that it would no longer

advance defense costs"); *In re WorldCom*, 354 F. Supp. 2d at 463 ("Where a preliminary injunction grants only part of the relief to which a movant would be entitled on the merits and requires a party 'to do what it should have done earlier,' then it is judged under the standard for prohibiting injunctions, and not the heightened standard for mandatory injunctions." (quoting *Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir. 1988))).[7]

Accordingly, the Court finds the lower prohibitory injunction standard applies.

### C.   <u>Irreparable Harm</u>

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted). "Thus, if a party fails to show irreparable harm, a court need not even address the remaining elements of the test." *Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-CV-8028 (JMF), 2018 WL 2089342, at *1 (S.D.N.Y. May 3, 2018). "To establish irreparable harm, a party seeking preliminary injunctive relief

---

[7]       In an unreported decision, one court stated in *dicta* that an injunction for the advancement of defense costs would amount to a mandatory injunction if the insurance company had not yet advanced any defense costs. *See Pereira v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 04 CIV. 1134 (LTS), 2006 WL 1982789, at *11 n.17 (S.D.N.Y. July 12, 2006) ("Defendants indicate that they have not advanced any defense costs to the Intervenors.  To the extent then that the Intervenors seek such costs, their request for injunctive relief would amount to a mandatory injunction rather than the requested prohibitory injunction seeking to keep the *status quo.*").  However, the *Pereira* court also found that a showing of irreparable harm for a prohibitory injunction had not been made. *Id.*  Additionally, the *Pereira* court did not address the holding of the *In re WorldCom* court from the year prior, which found that the prohibitory injunction standard applied even though the insurers had not advanced any defense costs.  354 F. Supp. 2d at 461, 463 ("Where a preliminary injunction grants only part of the relief to which a movant would be entitled on the merits and requires a party 'to do what it should have done earlier,' then it is judged under the standard for prohibiting injunctions, and not the heightened standard for mandatory injunctions.").

must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quotations omitted). Additionally, "irreparable harm must be shown to be actual and imminent, not remote or speculative." *Id.*

Plaintiff claims its failure to receive defense costs under the Policy is an immediate and direct injury sufficient to satisfy the irreparable harm requirement (Dkt. 11-4 at 12), as well as makes various other arguments regarding its fragile financial status (*id.* at 17). The Court finds Plaintiff has met its burden of showing a likelihood of irreparable harm if it fails to receive defense costs, and that it need not address Plaintiff's remaining arguments.

Courts in this Circuit have recognized that "[t]he failure to receive defense costs when they are incurred constitutes an immediate and direct injury." *In re WorldCom, Inc.*, 354 F. Supp. 2d at 469; *see XL Specialty Ins. Co.*, 874 F. Supp. 2d at 272-73 (collecting cases). It is true that most courts finding irreparable harm for the failure to receive defense costs have done so in the context of individuals or corporations facing criminal charges, *see, e.g.*, *In re Platinum-Beechwood Litig.*, 378 F. Supp. 3d 318, 329 (S.D.N.Y.) (finding failure to provide advance payments covering defense costs constitutes an irreparable harm "where the individual is defending against criminal prosecution, and where the actions for which the individual seeks advancement—whether criminal or civil—are complicated and costly"), *reconsideration denied*, 390 F. Supp. 3d 483 (S.D.N.Y. 2019), *reconsideration denied*, No. 18-CV-6658 (JSR), 2019 WL 3759171 (S.D.N.Y. July 23, 2019); *Li v. Certain Underwriters at Lloyd's, London*, 183 F. Supp. 3d 348, 361 (E.D.N.Y. 2016) ("Because

the Insurers have refused to advance any [criminal] defense costs to Li as he has incurred them, and prior to his trial, Li faces an actual and imminent injury and has established irreparable harm."); *Rocha v. Certain Underwriters at Lloyd's London*, No. 16CV2327RJDCLP, 2016 WL 8813433, at *4 n.5 (E.D.N.Y. Sept. 26, 2016) (same); *XL Specialty Ins. Co.*, 874 F. Supp. 2d at 273 (finding irreparable harm where insurance company stopped paying defense costs for insureds facing criminal charges "at a critical juncture for the defense"), or individuals facing civil liability, *see In re WorldCom, Inc.*, 354 F. Supp. 2d at 469 (finding director suffered irreparable harm where insurance company stopped paying defense costs at a "critical stage" of class action securities litigation); *see also Great Am. Ins. Co. v. Gross*, No. Civ.A. 305CV159, 2005 WL 1048752, at *1, *4 (E.D. Va. May 3, 2005) (finding former officers and directors of company facing "massive civil liability" were entitled to preliminary injunction where denial "would essentially cripple" their defense and cause them to "face a risk of great financial harm"); *In re CyberMedica, Inc.*, 280 B.R. 12, 18 (Bankr. D. Mass. 2002) ("Dr. Hotchkiss and Mr. Vilar are in need *now* of their contractual right to payment of defense costs and may be harmed if disbursements are not presently made to fund their defense of the Trustee's Complaint."); *In re Bos. Reg'l Med. Ctr., Inc.*, 285 B.R. 87, 96 (Bankr. D. Mass. 2002) ("The motion for interim relief is based on a need to avoid irreparable harm to the Nominal Defendants, not to ERI itself.  The Nominal Defendants need for the proceeds to be distributed to them *now*, so that they can procure the services of experts in time to effectively defend themselves in the [directors and officers] action."); *Freedom Specialty Ins. Co. v Platinum Mgmt. (NY), LLC*, No. 652505/2017, 2017 WL 6610417, at

*1 (N.Y. Sup. Ct. Dec. 27, 2017) ("The Insureds have insurance coverage under a \$5 million directors and officers . . . insurance policy[.]").

However, courts have found that there may be irreparable harm if a corporation demonstrates: (1) it cannot afford to pay legal fees in the underlying litigation absent insurance coverage; (2) absent payment of those legal fees, its current counsel will withdraw; and (3) a significant proceeding, such as a trial, is imminent in the underlying litigation. *See Emons Indus., Inc. v. Liberty Mut. Ins. Co.*, 749 F. Supp. 1289, 1294-95 (S.D.N.Y. 1990) (finding irreparable harm for corporation involved in ongoing civil litigation where either payment of legal fees or default judgments resulting from lack of defense would result in bankruptcy of company); *see also Dover Steel Co. v. Hartford Accident & Indem. Co.*, 806 F. Supp. 63, 68 (E.D. Pa. 1992) ("If [the corporation] avoids bankruptcy and seeks to continue to defend the [underlying] action, the issue of irreparable harm would arise if plaintiffs' attorneys choose to withdraw and were allowed to do so by the court and a significant legal event was in the offing (trial or argument on a significant motion) which plaintiffs were without the legal wherewithal to handle."). *But see Bondex Int'l, Inc. v. Hartford Acc. & Indem Co.*, No. 1:03-CV-01322, 2006 WL 2057349, at *1-2 (N.D. Ohio July 21, 2006) (finding corporation did not suffer irreparable harm from failure to receive defense costs where corporation only showed that payment of the legal fees would result in "significant financial harm" to the corporation, but not "the prospect of imminent bankruptcy"). Upon thorough review of Plaintiff's submissions (*see* Dkt. 15 at ¶ 38; Dkt. 15-2 at ¶¶ 14-18, 24; Dkt. 15-3 at 14-16; Dkt. 19 at 22-23; Dkt. 29 at ¶¶ 10-12; Dkt. 32 at 5; Dkt. 33 at 20), Plaintiff met its burden of demonstrating irreparable harm if it

did not receive an advancement of reasonable defense costs for the lawsuits previously scheduled to go to trial on March 20, 2020.[8]

Defendant argues that Plaintiff's delay in bringing the instant motion cuts against a finding of irreparable harm. "Considerable delay in filing an action seeking injunctive relief weighs against finding irreparable harm present." *Bus. & Residents All. of E. Harlem v. Martinez*, No. 03 CIV.5363 (JFK), 2003 WL 21982960, at *2 (S.D.N.Y. Aug. 20, 2003); *see Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 934 F.2d 30, 35 (2d Cir. 1991) ("[A]n extensive delay belies the surety's claim that it will suffer irreparable injury."); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276-77 (2d Cir. 1985) ("[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." (quotation and citation omitted)). Defendant disclaimed coverage under the Policy over four months before Plaintiff commenced the instant action—on September 13, 2019. Additionally, the state court trial was scheduled by the state court judge on or about November 13, 2019. However, Plaintiff asserts that its decision to bring suit and request a preliminary injunction hinged on a decision in early January by M&T Bank. (Dkt. 29 at ¶ 10). The Court finds this to be a sufficient explanation for the delay and, as previously discussed, that Plaintiff has established irreparable harm.

---

[8]      Obviously, events changed after this Court's granting of the preliminary injunction motion, including an adjournment of the trial and Plaintiff's bankruptcy filing. The Court's finding of irreparable harm is based on the facts as known at the time it issued its Order granting the preliminary injunction on February 25, 2020. Again, with respect to the preliminary injunction motion, this Decision and Order is merely intended to memorialize in greater detail the reasons that the Court reached its findings on February 25, 2020.

### D.      Likelihood of Success on the Merits

The Court also finds that Plaintiff has at least raised sufficiently serious questions regarding the merits of this case.  "Courts in this Circuit generally permit a movant who has established irreparable harm to demonstrate *either* 'a likelihood of success on the merits, or . . . sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.'"  *Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 76 (W.D.N.Y. 2018) (quoting *Able v. United States*, 44 F.3d 128, 130 (2d Cir. 1995)).  "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."  *Citigroup Glob. Markets, Inc.*, 598 F.3d at 35.

In the instant matter, the parties do not dispute that the Trial Litigation would be covered under the Policy's general coverage provisions absent preclusions or exclusions. Instead, the parties dispute whether the Illegal Conduct Exclusion, Prior Knowledge Exclusion, and the Consent to Settlement Provision exclude or preclude coverage under the Policy.  For the reasons that follow, the Court finds Plaintiff has at least raised sufficiently serious questions with respect to the applicability of each of the exclusions and provisions relied on by Defendant.

### 1.      Illegal Conduct Exclusion

Under New York Law, "[t]he obligation to defend the insured is triggered whenever there is a reasonable possibility that the allegations in the complaint will lead to coverage."

*Sils Brokerage Corp. v. U.S. Underwriters Ins. Co.*, No. 10-CV-5176, 2014 WL 1276586, at *4 (E.D.N.Y. Mar. 27, 2014). "An insurer bears the burden of proving the applicability of an exclusion of coverage." *Lend Lease (U.S.) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 136 A.D.3d 52, 59 (1st Dep't 2015), *aff'd sub nom. Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675 (2017). "To rely on an exclusion to deny coverage, an insurer must demonstrate 'that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.'" *Id.* (quoting *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 126 A.D.3d 76, 83 (1st Dep't 2015)).

"[W]hether a provision in an insurance policy is ambiguous is . . . for the court to determine as a matter of law." *Concordia Gen. Contracting Co. v. Preferred Mut. Ins. Co.*, 932, 934, (2d Dep't 2017). "The test for ambiguity is whether the language in the insurance contract is 'susceptible of two reasonable interpretations.'" *MDW Enters. v. CNA Ins. Co.*, 4 A.D.3d 338, 340-41 (2d Dep't 2008) (quoting *New York v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985)). "[T]he ambiguities in the policy ordinarily are construed in favor of coverage and against the insurer, because as the drafter of the policy the insurer is responsible for the ambiguity." *Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999).

In the instant matter, the Policy states that Defendant "shall advance Defense Costs . . . on behalf of the Insured prior to final disposition" of a claim, and defines claims to include civil and criminal proceedings. (Dkt. 1-1 at 14). However, the Policy also provides an exclusion for illegal conduct, which reads as follows:

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured . . . arising out of, based upon or attributable to the . . .  committing of any deliberate criminal or deliberate fraudulent act, or any willful violation of any statute, rule or law, if any final adjudication establishes that such deliberate criminal or deliberate fraudulent act, or willful violation of statute, rule or law was committed.

(*Id.* at 20).

Plaintiff argues that the DPA and Stipulation, and the admissions of fact contained therein, do not constitute a "final adjudication."  Plaintiff further argues that even if the DPA and Stipulation were final adjudications, the NY Opioid Lawsuits do not arise out of any deliberate criminal or fraudulent acts because the underlying causes of action do not require an underlying crime or fraud.  For the following reasons, the Court finds that the DPA is not a final adjudication, and that even if the Stipulation is a final adjudication, nothing in the Stipulation establishes Plaintiff committed a deliberate criminal or deliberate fraudulent act, or willfully violated a statute, rule, or law.

As far as the DPA, the Policy does not define the term "final adjudication."[9] Additionally, the parties have not cited to any case addressing whether a deferred prosecution agreement constitutes a final adjudication in the context of an insurance policy, nor has the Court's research found any such case.  However, the Court finds that neither the purpose nor the execution of a deferred prosecution agreement comports with the plain meaning of "final adjudication."

---

[9]     Under New York law, the lack of a definition for a term in a policy does not necessarily render the word ambiguous.  *See Lend Lease (U.S.) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 136 A.D.3d 52, 56 (1st Dep't 2015) ("Nor does the lack of a definition, in and of itself, render a word ambiguous."), *aff'd sub nom.*, 28 N.Y.3d 675 (2017).

The Second Circuit has described a deferred prosecution agreement as follows:

> Under a typical DPA with a corporate defendant, the defendant admits to a statement of facts, submits to the filing of criminal charges against it on the basis of those facts, and agrees to a forfeiture or fine and to institute remedial measures.  In exchange, the government agrees to defer prosecution and to ultimately seek dismissal of all charges if the defendant complies with the DPA.

*United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 129 (2d Cir. 2017).  Once the agreement's conditions are fulfilled, the government moves to dismiss the charges with prejudice and enters a *nolle prosequi* with the court.  "A nolle prosequi is a unilateral act by a prosecutor, which ends the pending proceedings without an acquittal and without placing the defendant in jeopardy."  *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (quotation omitted).  "If the government determines that the defendant has breached the DPA, however, the government may rip up the agreement and pursue the prosecution."  *HSBC Bank USA*, 863 F.3d at 129.

It is true that as a procedural matter, a district court must review a deferred prosecution agreement to decide whether to exclude the time for the deferred prosecution under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(2).  However, the Second Circuit has held the court's role is limited to determining whether the deferred prosecution agreement "is *bona fide* before granting a speedy trial waiver—that is, that the DPA in question is genuinely intended to 'allow[ ] the defendant to demonstrate his good conduct,' § 3161(h)(2), and does not constitute a disguised effort to circumvent the speedy trial clock."  *HSBC Bank USA*, 863 F.3d at 138.  In other words, courts do not "evaluate the substantive merits of a DPA or . . . supervise a DPA's out-of-court implementation."  *Id.*;

*see United States v. Fokker Servs. B.V.*, 818 F.3d 733, 746 (D.C. Cir. 2016) ("[A] DPA's provisions are agreed to by the parties, not the court, with no occasion for the court to adopt the agreement's terms as its own.").

A deferred prosecution agreement does not comport with the definition of "final." Black's Law Dictionary defines "final" as "*not requiring any further judicial action* by the court that rendered the judgment to determine the matter litigated concluded," and "*not requiring any further judicial action* beyond supervising how the decree is carried out." Black's Law Dictionary (11th ed. 2019) (emphasis added).  As discussed above, a deferred prosecution agreement requires further judicial action after the court has made its Speedy Trial determination—the court must either rule on dismissal of the charges or, in the event of a breach of the deferred prosecution agreement, preside over the prosecution of the case.

Nor does a deferred prosecution agreement fit into the definition of "adjudication." "Adjudication" is defined as "[t]he legal process of resolving a dispute; the process of judicially deciding a case."  Black's Law Dictionary (11th ed. 2019).  The Second Circuit has made clear that courts should not substantively review deferred prosecution agreements, *see HSBC Bank USA*, 863 F.3d at 138, so it cannot be said that their contents are judicially decided.  Additionally, deferred prosecution agreements do not resolve the underlying dispute because the agreement is contingent upon the defendant complying with its terms.  *C.f. First Mercury Ins. Co. v. Law Office of Kenneth B. Schwartz*, No. CV171763SJFAKT, 2019 WL 2053850, at *16 (E.D.N.Y. Mar. 1, 2019) (finding conditional plea agreement was not a final adjudication for purposes of an illegal conduct exclusion where charge based on criminal, dishonest, fraudulent, or malicious conduct was

- 23 -

withdrawn at sentencing), *report and recommendation adopted as modified sub nom.* 2019
WL 6606115 (E.D.N.Y. Dec. 5, 2019), *appeal filed*, No. 20-53 (2d Cir. Jan. 6, 2020).

Defendant argues that even if the DPA itself is not a final adjudication, the facts
stipulated to by Plaintiff therein constitute a final adjudication because the DPA expressly
provides that Plaintiff will not contradict those facts in other litigation or proceedings.
(Dkt. 19 at 27-28; *see* Dkt. 11-1 at 175 ("[Plaintiff], having truthfully admitted to the facts
in the Statement of Facts, agrees that it shall not . . . make any statement, in litigation or
otherwise, contradicting the Statement of Facts or its representations in this Agreement.")).
However, as previously discussed, courts do not substantively review deferred prosecution
agreements, so their contents do not constitute adjudications.  Moreover, whether Plaintiff
can contradict the factual admissions contained in the DPA is related to a different word in
the Illegal Conduct Exclusion: "establishes."  The Illegal Conduct Exclusion applies "if
any final adjudication *establishes* that such deliberate criminal or deliberate fraudulent act,
or willful violation of statute, rule or law was committed."  (Dkt. 1-1 at 20 (emphasis
added)).  Whether Plaintiff can contest the factual admissions in the DPA relates to whether
those facts have been established, not whether they are final adjudications.[10]  *See J.P.
Morgan Sec. Inc.*, 126 A.D.3d at 83 (finding settlement documents did not "establish" guilt
for purposes of a dishonest acts exclusion where plaintiff "reserved the right to profess its
innocence in unrelated proceedings").  Accordingly, the Court finds that while the DPA

---

[10]     As Plaintiff points out, other policies include the phrase "final adjudications *and
admissions*" to make an illegal conduct exclusion triggerable by factual statements as well
as final adjudications.  (Dkt. 27 at 7-8).

may establish the factual admissions contained therein, it is not a final adjudication, and therefore does not trigger the Illegal Conduct Exclusion.

Whether the Stipulation constitutes a final adjudication is a closer question.  The Stipulation was "So Ordered" by a United States District Judge (Dkt. 11-1 at 325), which indicates that the judge reviewed the substance of the Stipulation, and the case has since been closed, indicating that neither the parties nor the presiding judge believe that further judicial action is required.  However, the Court need not determine whether the Stipulation is a final adjudication because even if it is, Defendant has not met its burden of demonstrating that the Stipulation establishes a "deliberate criminal or deliberate fraudulent act, or willful violation of statute, rule or law was committed."  (Dkt. 1-1 at 20). At the very least, there are sufficiently serious questions raised with respect to that issue so as to warrant the granting of Plaintiff's requested relief.

Defendant contends the admissions made by Plaintiff in Paragraph 2.a of the Stipulation[11] are sufficient to meet the requirements of the Illegal Conduct Exclusion. Paragraph 2.a reads:

> RDC knowingly failed to implement an adequate system to detect, investigate, and report suspicious orders of controlled substances to the DEA. RDC received and fulfilled over 1.5 million orders for controlled substances from its pharmacy customers, including hundreds of thousands of orders for highly-abused drugs. . . .  However, during this period, RDC reported only a

---

[11]    Defendant contended at oral argument that the Stipulation incorporates the admissions contained in the DPA by reference.  (Dkt. 33 at 28-31).  Although the Stipulation does refer to the DPA, it does so in the context of retaining an independent compliance monitor and does not anywhere reference the portion of the DPA where the factual admissions were made.  (Dkt. 15 at 313 ("The manner in which the Monitor will be selected, the Monitor's responsibilities and mandate, and the Monitor's reporting obligations are set forth in Exhibit E to the DPA.")).

total of 4 suspicious orders to the DEA, notwithstanding senior management's awareness of the company's reporting obligations under the [Controlled Substances Act].  RDC failed to report to the DEA at least two thousand orders of controlled substances made by its pharmacy customers that should have been reported as suspicious pursuant to the criteria set forth in 21 C.F.R. § 1301.74(b) and the guidance contained in the DEA Letters.

(Dkt. 15 at 309).

Plaintiff does not conclusively admit to deliberately committing a crime or deliberately defrauding the DEA in this paragraph of the Stipulation.  Moreover, the federal civil complaint underlying the Stipulation does not allege any cause of action rooted in deliberate criminal or fraudulent acts, but instead alleges a claim for failure to report suspicious orders in violation of 21 U.S.C. § 842(a)(5) and 21 C.F.R. § 1301.74(b), *see* Complaint, *United States of America v. Rochester Drug Co-Operative, Inc.*, No. 1:19-cv-03568-LAK, Dkt. 1 at 14-15 (S.D.N.Y. Apr. 23, 2019), neither of which necessarily address deliberate criminal or fraudulent conduct, *see* 21 U.S.C. § 842(a)(5) ("It shall be unlawful for any person . . . to refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under this subchapter[.]"); 21 C.F.R. § 1301.74(b) ("The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances.  The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.").  Indeed, the statute explicitly provides that unless a person is convicted by a trier of fact in a criminal case, "a violation of this

section does not constitute a crime, and a judgment for the United States and imposition of a civil penalty . . . shall not give rise to any disability or legal disadvantage based on conviction for a criminal offense."  21 U.S.C. § 842(c)(3).

It is also not clear from the Stipulation that Plaintiff admitted to committing a *willful* violation of 21 C.F.R. § 1301.74(b).  The Stipulation states that Plaintiff "*knowingly* failed to implement an adequate system" for reporting suspicious orders (Dkt. 11-1 at 309), not that Plaintiff *willfully* failed to do so.  "The word 'willfully' is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears."  *Bryan v. United States*, 524 U.S. 184, 191 (1998).  "The word often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental," *id.* at 191 n.12, and in the criminal context, "willfully" means the defendant acted with knowledge that the conduct was unlawful, whereas "the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense."  *Id.* at 192-93.  It is not clear what meaning "willful" has in the Policy, or whether "knowingly" failing to implement a system to report suspicious orders, or failing to report orders "that should have been reported," rises to a level of willfulness.  Accordingly, the Court finds that at this stage it is not clear whether the Illegal Conduct Exclusion is subject to another reasonable interpretation than the one posed by Defendant.  Again, at the very least, Plaintiff has raised sufficiently serious questions going to the merits of the applicability of that Exclusion.

### 2.      Prior Knowledge Exclusion

Defendant also contends that coverage under the Policy is barred by a Prior Knowledge Exclusion included in the Application and incorporated into the Policy.

Although the record is less clear on this Exclusion than others, at this point in the proceedings the Court finds there are at least serious questions as to whether Defendant will ultimately be able to demonstrate that it applies to coverage for all of Plaintiff's defense costs.

The Application submitted by Plaintiff asks if "any person or entity proposed for coverage know[s] of or ha[s] information about any pending or prior claim, suit, regulatory action or other proceedings, inquiry or investigation (any of which being a 'Known Claim') of or against any proposed insured," to which Plaintiff answered "No." (Dkt. 17-4 at 10). Under the same section, the Application states: "IT IS AGREED THAT IF ANY SUCH KNOWN CLAIM, PRIOR ACTION OR POTENTIAL EXPOSURE EXISTS, THEN, UNLESS THE RESULTING INSURANCE POLICY EXPRESSLY PROVIDES OTHERWISE, SUCH POLICY SHALL NOT PROVIDE COVERAGE FOR ANY LOSS IN CONNECTION WITH SUCH KNOWN CLAIM, PRIOR ACTION OR POTENTIAL EXPOSURE." (*Id.* at 12). The Application also provides "that if the information supplied on this [A]pplication changes between the date of this [A]pplication and the effective date of the [Policy], the Applicant will . . . immediately notify the Insurer of such changes." (*Id.* at 38). Additionally, the Policy states that "[t]he Application shall be deemed attached to and part of this Policy." (Dkt. 1-1 at 69).

The Application was submitted by Plaintiff on February 1, 2017. (Dkt. 17-4 at 40). On February 15, 2017, the DEA served a civil document request on Plaintiff, citing 21 U.S.C. § 2703(c)(2) as its authority. (Dkt. 11-1 at 242; *see* Dkt. 43 at ¶ 3). On March 8, 2017, at Plaintiff's request, the DEA provided Plaintiff with a revised document citing 21

U.S.C. § 876 as its authority.  (Dkt. 43 at ¶¶ 3-4).  Both documents provided that Plaintiff should not disclose the existence of the requests or the investigation for an indefinite time period.  (*Id.* at ¶ 5).  The coverage period for the Policy also began on March 8, 2017.  (Dkt. 1-1 at 2).

As a preliminary matter, Plaintiff makes numerous arguments regarding a separate rescission provision in the Policy.  The Court agrees with Defendant that these arguments do not address whether the Prior Knowledge Exclusion in the Application bars coverage for the State Actions.  *See XL Specialty Ins. Co.*, 874 F. Supp. 2d at 280 ("[U]nder the case law, the contractual defenses of rescission and exclusion are distinct.  They must be analyzed pursuant to separate principles."); *XL Specialty Ins. Co. v. Agoglia*, No. 08 CIV.3821(GEL), 2009 WL 1227485, at *6 (S.D.N.Y. Apr. 30, 2009) (analyzing similar provision as exclusion), *on reconsideration sub nom. Murphy v. Allied World Assur. Co.*, No. 08 CIV. 3821 (GEL), 2009 WL 1528527 (S.D.N.Y. May 29, 2009), and *aff'd sub nom. Murphy v. Allied World Assur. Co. (U.S.)*, 370 F. App'x 193 (2d Cir. 2010).

However, there are sufficiently serious questions regarding whether the Prior Knowledge Exclusion applies to all of Plaintiff's claimed defense costs to make those questions a fair ground for litigation.  The Prior Knowledge Exclusion states that the Policy will not provide coverage in connection with a "Known Claim," and the phrase "Known Claim" is defined as "any pending or prior . . . inquiry or investigation" that "any person or entity proposed for coverage know[s] of or ha[s] information about."  (Dkt. 17-4 at 10, 12).  Defendant contends that because Plaintiff had knowledge of the investigation by the DEA before the Policy was issued, the investigation was a Known Claim.  (Dkt. 35 at

12-13).[12]   The record before the Court shows that the only investigation Plaintiff had knowledge of before the Policy issued was the civil investigation—the record does not show that Plaintiff had knowledge of the criminal investigation before November 2017, let alone before the Policy was issued on March 8, 2017.  Accordingly, the only investigation that the record supports as being a "Known Claim" is the investigation related to the DEA's civil lawsuit.

The other key portion of the Prior Knowledge Exclusion is the phrase "in connection with": the policy does not provide coverage for any loss "in connection with" a "Known Claim."  (Dkt. 17-4 at 12).  Courts have interpreted the phrase "in connection with" as broader than "arising out of."  *See Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001) ("Courts have similarly described the term 'relating to' as equivalent to the phrases 'in connection with' and 'associated with,' and synonymous with the phrases 'with respect to,' and 'with reference to,' and have held such phrases to be broader in scope than the term 'arising out of.'" (citations omitted)).

Defendant points to the operative complaints as well as a motion for partial summary judgment in the Trial Litigation as demonstrative of those actions being "in connection with" the "Known Claims."  (Dkt. 35 at 20).  It is true that the motion for partial summary judgment was based on the admissions made by Plaintiff in the Stipulation.  (*See*

---

[12]   Plaintiff appears to argue that because the original subpoena issued by the DEA contained an error, Plaintiff did not have knowledge of an ongoing investigation against it. (Dkt. 50 at 19 n.4).  The Court is not persuaded by this argument, particularly in light of Plaintiff's contention that it notified the DEA of the issue and asked for a corrected subpoena.  (Dkt. 43 at ¶ 3).

Dkt. 41 at 13).  However, that does not mean that *all* of the pending claims against Plaintiff in the Trial Litigation are "in connection with" the February 2017 civil investigation, particularly the claims that Plaintiff will be going to trial on.  The plaintiffs in the Trial Litigation moved for partial summary judgment "with regard to their claims for public nuisance (Count III), unjust enrichment (Count VI) and negligence (Count VII), insofar as those claims are predicated on [Plaintiff]'s failure to distribute opioids in a reasonably prudent manner" as admitted by Plaintiff in the Stipulation.  (*Id.*).  In other words, at the time the Court issued the Order on the preliminary injunction motion, the issues predicated on the conduct admitted to by Plaintiff in the Stipulation were potentially going to be addressed via summary judgment motions, not at the trial.  The state court has since issued a decision denying the motion, specifically finding:

> Notwithstanding the April 2019 stipulation of settlement and dismissal between the defendant and the United States . . . the plaintiffs failed to demonstrate a prima facie case that defendant's conduct . . . created or contributed to a situation which endangered or injured the property, health, safety or comfort of a considerable number of people.

*In re Opioid Litig.*, No. 400000/2017, Dkt. 6509 (N.Y. Sup. Ct., Suffolk Cty., May 14, 2020).  The court additionally ruled that it would defer its decision on the unjust enrichment and negligence claims because of its previous ruling that all "substantive motion practice unrelated to the liability aspect of the public nuisance claims shall be deferred pending the conclusion of the first phase of the trial."  *Id.*  Stated differently, the admissions in the Stipulation were not sufficient to establish a prima face nuisance claim against Plaintiff, and there are sufficiently serious questions as to whether the only issues presently going to trial are "in connection with" the Stipulation.

Moreover, it is uncontested that Plaintiff did properly disclose the existence of the criminal investigation.  As previously discussed, the conduct discussed in the DPA was much more extensive than, and does not necessarily overlap with, the conduct addressed in the Stipulation.  *See Georgetown Cap. Grp., Inc. v. Everest Nat'l Ins. Co.*, 104 A.D.3d 1150, 1153 (4th Dep't 2013) ("[The insurer] relies on, inter alia, the policy's exclusion for 'Loss in connection with any Claim made against an Insured. . . .'  We agree with plaintiffs, however, that [the insurer] failed to demonstrate that the allegations in the underlying actions fall solely and entirely within that policy exclusion, and are subject to no other interpretation.  As noted above, the underlying actions include allegations that Georgetown and/or Royal failed to supervise Geidel and that Geidel advised investors to sell legitimate securities." (original alterations and quotation omitted)); *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 13 A.D.3d 599, 600 (2d Dep't 2004) ("[T]he 'Seepage and/or Pollution and/or Contamination Exclusion' in this policy, which provides that '[e]xcept as provided for in Section VII, clauses 7. and 8., this policy does not insure against loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination, direct or indirect, arising from any cause whatsoever,' does not apply to exclude the alleged losses claimed by Pepsico, which are non-environmental in nature." (second alteration in original)).  Accordingly, the Court finds there are sufficiently serious questions as to whether *all* of Plaintiff's defense costs are "in connection with" the civil investigation, and "[a]n insurer must defend the entire action, even if some causes of action fall squarely within policy exclusions, so long as there is one claim that 'arguably arise[s] from covered events.'"  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City of Oswego*, 295

A.D.2d 905, 906 (4th Dep't 2002) (second alteration in original) (quoting *Frontier Insulation Contrs. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997)).

Additionally, there are sufficiently serious questions as to whether the doctrine of equitable estoppel could apply in the instant matter.  "The doctrine of equitable estoppel can be applied to prevent an insurer from asserting valid defenses or exclusions to coverage." *N. River Ins. Co. v. Town of Grand Island*, No. 93-CV-100S, 1995 WL 250391, at *7 (W.D.N.Y. Mar. 31, 1995) (quoting *Mattimore v. Patroon Fuels, Inc.*, 103 A.D.2d 981, 982 (3d Dep't 1984)).  "Under New York common law, an insurer, who undertakes the defense of an insured, may be estopped from asserting a defense to coverage, no matter how valid, if the insurer unreasonably delays in disclaiming coverage and the insured suffers prejudice as a result of that delay." *Bluestein & Sander v. Chicago Ins. Co.*, 276 F.3d 119, 122 (2d Cir. 2002) (quoting *Globe Indem. Co. v. Franklin Paving Co.*, 77 A.D.2d 581, 430 N.Y.S.2d 109, 111 (2d Dep't 1980)).  "To show prejudice, the insured must show reliance and a change in position resulting from the delay." *William Crawford, Inc. v. Travelers Ins. Co.*, 838 F. Supp. 157, 160 (S.D.N.Y. 1993), *aff'd*, 23 F.3d 663 (2d Cir. 1994).  "[P]rejudice to an insured may be presumed 'where an insurer, though in fact not obligated to provide coverage, without asserting policy defenses or reserving the privilege to do so, undertakes the defense of the case, in reliance on which the insured suffers the detriment of losing the right to control its own defense.'" *Bluestein & Sander*, 276 F.3d at 122 (quoting *Albert J. Schiff Assocs., Inc. v. Flack*, 51 N.Y.2d 692, 699 (1980)).

In the instant matter, as discussed above, the documents filed under seal by Plaintiff indicate that it has suffered prejudice in its ability to defend itself as a result of Defendant's

delay in disclaiming coverage. Additionally, Plaintiff disclosed to Defendant that it was being criminally investigated by the DEA in November 2017. Subsequent to that disclosure, Defendant issued several letters indicating that it would cover Plaintiff's defense costs for the State Actions, as well as renewed the policy in March 2018. (*See, e.g.*, Dkt. 11-1 at 338-42). It does appear that Defendant expressly reserved its rights in the coverage letters it sent Plaintiff (*see, e.g.*, *id.* (February 19, 2019 letter from Defendant to Plaintiff stating: "[Defendant] is pleased to confirm coverage for the Otsego and Cattaraugus County matters . . . subject to currently known information and a full reservation of rights at law and under the terms of the Policy.")), and express reservations of rights can "preclude arguments both as to waiver and as to equitable estoppel," *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 176 (2d Cir. 2006). However, the Court finds that Defendant's renewal of the insurance policy subsequent to Plaintiff's timely disclosure of a criminal investigation, paired with its issuance of coverage letters also subsequent to that disclosure, raises substantially serious questions as to whether Defendant is now estopped from denying coverage on the basis of its lack of knowledge of a civil investigation. *C.f. Pereira v. Gulf Ins. Co.*, 330 F. App'x 5, 6 (2d Cir. 2009) ("[T]here can be no estoppel where . . . the insurers timely reserved their rights to decline coverage *and took no action inconsistent with denial of coverage*." (emphasis added)).

Defendant also contends that even if the Prior Knowledge Exclusion does not apply, the fortuitous loss doctrine, also referred to as the known loss doctrine, should bar Plaintiff's recovery. The fortuitous loss doctrine is the principle that an insurer only need provide coverage when the inevitability "of such loss was not known to the insured before

coverage took effect." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Stroh Cos.*, 265 F.3d 97, 109 (2d Cir. 2001). "[W]hether or not a loss is fortuitous is a legal question to be resolved by the Court." *Renaissance Art Inv'rs, LLC v. AXA Art Ins. Corp.*, 102 A.D.3d 604, 605 (1st Dep't 2013) (original alterations and quotation omitted).

Defendant argues that because Plaintiff has admitted that it engaged in ongoing, intentional activity despite having previously been fined by the government, and because Plaintiff had notice of another government investigation before the Policy was issued, any loss resulting from Plaintiff's misconduct is not a fortuitous loss. (Dkt. 35 at 17-19). Defendant relies on a line of cases discussing that in the context of all-risk insurance policies, "damages that flow directly and immediately from [the insured's] intentional act cannot be considered 'accidental' or fortuitous." *Stroh Cos.*, 265 F.3d at 111 (quotation omitted) (holding fortuitous loss doctrine did not apply because "no reasonable jury could find on the evidence presented to the district court that [the insureds] knew that a recall was inevitable before, but delayed initiating it until after [the insureds'] products had been added to the Policy"). However, this line of cases is inapplicable to Plaintiff. The "loss" in the instant matter is the cost of Plaintiff's defense in the State Actions, not lost profits from a faulty product. Nothing before the Court shows that Plaintiff had knowledge of the extent of the damage caused by its alleged unlawful drug distribution, and the Court cannot say that Plaintiff knew without any doubt when it was filling opioid orders that it would eventually face over 30 civil lawsuits filed by different state entities. *See Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1215 (2d Cir. 1995) ("Though [the insured] was aware, prior to the inception of many of the policies, that its products risked

asbestosis and cancer diseases and had received a large number of claims, it was highly

uncertain . . . as to the prospective number of injuries, the number of claims, the likelihood

of successful claims, and the amount of ultimate losses it would be called upon to pay.

[The insured] was fully entitled to replace the uncertainty of its exposure with the precision

of insurance premiums and leave it to the insurers' underwriters to determine the

appropriate premiums." (footnote omitted)), *opinion modified on different grounds on*

*denial of reh'g*, 85 F.3d 49 (2d Cir. 1996).  Accordingly, the Court finds the fortuitous loss

doctrine does not act as a bar to coverage here.

### 3.    Consent to Settlement Provision

Defendant further contends that the Consent to Settlement Provision of the Policy

also bars payment of Plaintiff's defense costs for the Trial Litigation.  "[C]onsent-to-settle

provisions—requiring insured parties to give insurers notice before entering into voluntary

settlement agreements—are 'routinely enforced' as 'a condition precedent to coverage.'"

*SI Venture Holdings, LLC v. Catlin Specialty Ins.*, 118 F. Supp. 3d 548, 550 (S.D.N.Y.

2015).

> The Policy's Consent to Settlement Provision reads as follows:
>
> [T]he Insured shall not admit or assume any liability, enter into any
> settlement agreement, stipulate to any judgment, incur any Defense Costs or
> Reputation Loss . . . without the prior written consent of the Insurer.  If the
> Insured admits or assumes any liability in connection with any Claim without
> the consent of the Insurer, then the Insurer shall not have any obligation to
> pay Loss with respect to such Claim.

(Dkt. 1-1 at 26).  Defendant contends the admissions made by Plaintiff in the Stipulation and DPA "form the very foundation" for Plaintiff's liability in the State Actions, and as a result the Consent to Settlement Provision bars coverage.

The Court again finds there are sufficiently serious questions as to whether the Consent to Settlement Provision bars Plaintiff's coverage.  Courts that have found such provisions enforceable have done so when the insured previously made an agreement with an entity that was a party to the lawsuit for which the insured sought to have its defense costs covered.  *See Traveres Indem. Co. v. Northrop Grumman Corp.*, 4 F. Supp. 3d 599, 611-12 (S.D.N.Y. 2014) (finding provision was breached and insured was not entitled to coverage "for any Water District claims" where the insured had previously agreed to pay remediations costs to the water districts).  Here, Plaintiff has not entered into any agreement with the plaintiffs in the State Actions, but with a federal government agency. Additionally, Plaintiff's admissions of liability in the Stipulation and DPA were with regards to federal claims.  Plaintiff has not admitted liability as to the state law claims pending in the State Actions, and the record before the Court shows that Plaintiff is actively litigating whether the admissions it made in the Stipulation and the DPA are sufficient to entitle the plaintiffs in the State Actions to recovery on three state law causes of action. (*See* Dkt. 41).  In other words, Plaintiff has neither admitted nor assumed liability in connection with the State Actions.

The case Defendant relies on is not dispositive.  In *First Mercury*, the insured executed two affidavits of confession of judgment as part of a plea agreement, each of which confessed judgment in a certain amount as to two individuals who had civil actions

pending against the insured and represented the insured's civil liability to those individuals "for the conduct giving rise to the charges in the Indictment."  2019 WL 2053850, at *5. The court found that the affidavits "show that [the defendant]'s obligations under the Affidavits and Plaintiff's potential coverage obligations under the [insurance policy] are conterminous" because they created an obligation constituting a portion of the liability in the civil actions.  *Id.* at *17.  In the instant matter, Plaintiff did not admit to any liability as to the State Action plaintiffs in either the DPA or Stipulation, and the damages sought by the plaintiffs in the State Actions are entirely separate from the payments Plaintiff has agreed to in the DPA and Stipulation.  Accordingly, the Court concludes that there are sufficiently serious questions going to the merits of whether the Consent to Settlement Provision applies in the instant matter to make them a fair ground for litigation.

### E.    Public Interest

"[W]hen a court orders injunctive relief, it should ensure that the injunction does not cause harm to the public interest."  *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 200 (E.D.N.Y. 2013) (quoting *U.S. S.E.C. v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012)).  "There is a well-recognized public interest in enforcing contracts and upholding the rule of law."  *Empower Energies, Inc. v. SolarBlue, LLC*, No. 16-cv-3220 (DLC), 2016 WL 5338555, at *13 (S.D.N.Y. Sept. 23, 2016); *see GE Transp. (Shenyang) Co. v. A-Power Energy Generation Sys., Ltd.*, No. 15 Civ. 6194 (PAE), 2016 WL 3525358, at *9 (S.D.N.Y. June 22, 2016) ("[T]he public interest is served by the enforcement of parties' rights under their contract. . . ."); *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG), 2012 WL 5895784, at *2 (S.D.N.Y. Nov. 21, 2012)

("The public interest of enforcing contracts and upholding the rule of law will be served by the issuance of this Order. . . .").

The Court finds that the issuance of this injunction would serve the public interest by holding Defendant to its contractual obligations.  Plaintiff was entitled to expect that it could hold Defendant to the terms of those agreements should a dispute arise.  As a result of Defendant's potential failure to adhere to its obligations, Plaintiff faced the prospect of losing its defense counsel prior to trial pending at the time the preliminary injunction issued.  *See Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) ("The public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense.").  Accordingly, for the reasons stated above, the Court finds that issuing a preliminary injunction is appropriate.

### F.   <u>Bond</u>

Plaintiff has asked, in the event that the Court grants its motion for a preliminary injunction, that the requirement to post a bond be waived.  Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Second Circuit has found that Rule 65 gives the district court discretion to decide whether, under the circumstances, security is required. *See Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004).  "[T]he district

court may dispense with security where there has been no proof of likelihood of harm to the party enjoined." *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974).

The Court finds that under the circumstances, a bond is required.  "[W]rongfully enjoined parties are entitled to a presumption in favor of recovery," and "permitting recovery is consistent with the purpose of an injunction bond." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 560 (2d Cir. 2011).  Plaintiff's submissions have demonstrated that, due to its current financial circumstances, if a determination is ultimately made finding it is not entitled to coverage, Plaintiff would almost certainly not be able to repay Defendant for the defense costs advanced.  While the Court has concluded that Plaintiff has established the appropriateness of a preliminary injunction, the Court cannot say with certainty that Plaintiff will prevail at the end of the litigation.  In light of the uncertainties surrounding Plaintiff's business as whole, and especially in light of the early juncture of this litigation and the uncertainty surrounding its ultimate disposition, the Court finds that waiving a bond would present an unreasonable likelihood of harm to Defendant that cannot be justified.

The case Plaintiff principally relies on, *XL Specialty Ins. Co.*, 874 F. Supp. 2d 263, does not dictate a different result.  In that case, the court did not address whether the insureds had the financial wherewithal to repay the insurer in the event the insureds were not entitled to coverage, and specifically noted that "the Policy requires defense costs to be repaid if the Insureds are ultimately not entitled to such payments, and [the insurer] is at liberty, upon such a determination, to pursue repayment from the individual Insureds" as well as the corporation the insureds worked for.  *Id.* at 298.

For the reasons stated above, the Court finds that Plaintiff is entitled to a preliminary injunction requiring Defendant to pay the defense costs for the trial previously scheduled to begin March 20, 2020, but the implementation of the preliminary injunction is contingent upon Plaintiff posting a bond in the amount of five hundred thousand dollars ($500,000) which the Court determines to be reasonable under the circumstances.[13]

## III.   <u>Motion to Dismiss</u>

Defendant makes the same arguments in support of its motion to dismiss as it did to oppose Plaintiff's motion for preliminary injunction (*see* Dkt. 21; Dkt. 48), and the Court has considered all of Defendant's arguments in its evaluation of the motion for preliminary injunction.  The Court's conclusions apply with even more force in the context of a motion to dismiss.  Accordingly, the Court denies Defendant's motion for the reasons stated above.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss (Dkt. 21) is denied. Plaintiff's motion for a preliminary injunction (Dkt. 11) is granted as previously referenced in the Court's Order entered on February 25, 2020 (Dkt. 44).

---

[13]    Plaintiff has made certain representations concerning the anticipated length and cost of the trial.  Under the circumstances, the Court concludes that a bond of $500,000, is appropriate.  *See Corning Inc.*, 365 F.3d at 158 ("Rule 65(c) gives the district court wide discretion to set the amount of a bond[.]" (quotation omitted)); *Midas Int'l Corp. v. T & M Unlimited, Inc.*, No. 00-CV-0899E(F), 2000 WL 1737946, at *5 (W.D.N.Y. Nov. 17, 2000) ("The amount of the bond required is in the discretion of the district court.").

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: June 11, 2020
        Rochester, New York